**WICHITA CLINIC, P.A., and Integrated Healthcare Systems, Inc., Plaintiffs,**

**v.**

**COLUMBIA/HCA HEALTHCARE CORP., and HCA Health Services of Kansas, Inc., Defendants.**

**No. 96–1336–JTM.**

United States District Court, D. Kansas.

March 31, 1999.

Order Denying Reconsideration May 11, 1999.

---

Sara E. Welch, Stinson, Mag & Fizzell, P.C., Kansas City, MO, Patrick J. Stueve, Kirk A. Peterson, Anthony J. Durone, Berkowitz, Feldmiller, Stanton, Brandt, Williams & Stueve, LLP, Kansas City, MO, Roger D. Stanton, Berkowitz, Feldmiller, Stanton Brandt, Williams & Stueve, LLP, Prairie Village, KS, for Plaintiffs.

James R. Eiszner, Shook, Hardy & Bacon L.L.P., Kansas City, MO, J. Eugene Balloun, William R. Sampson, David A. Rameden, Shook, Hardy & Bacon L.L.P., Overland Park, KS, for Defendants.

Terry L. Unruh, Grace, Unruh & Pratt, L.C., Wichita, KS, for Movant.

### *MEMORANDUM ORDER*

MARTEN, District Judge.

The present action involves claims by the plaintiffs, Wichita Clinic and Integrat-

ed Healthcare Systems, Inc., against the defendants, Columbia/HCA and Wesley Hospital, for federal antitrust violations, along with state tort claims. The substance of the action was previously addressed by the court in its resolution of the defendants' motion to dismiss. *Wichita Clinic v. Columbia/HCA Corp.*, No. 96–1336–JTM, 1997 WL 225966 (D.Kan. April 8, 1997). The matter is currently before the court on the competing motions for partial summary judgment submitted by the parties.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance.

*Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).[1]

1. The findings of fact contained in the following discussion are those which the court finds have been presented in a manner consistent with Fed.R.Civ.Pr. 56 and D.Kan.R. 56.1. To the extent certain proposed findings by the parties are not included herein, it is because the court has found that the supporting pleadings and evidentiary materials wholly fail to provide support for the assertions, reflect hearsay or unsupported opinions, or fail to comply with Rule 56.1. In particular, the court notes the plaintiffs' frequent failure to provide record references in compliance with the rule. Thus, in their response to defendants' Fact ¶ 289, plaintiffs simply state "See Plfs' SOF 188–382," thereby incorporating *195* of the paragraphs in their independent statement of facts. This is hardly the short and concise reference to the record required by the rule.

The court must also note there are significant problems with plaintiffs' motion for partial summary judgment. The plaintiffs repeatedly assert, as alleged uncontroverted facts, matters which have no evidentiary support. Further, almost the entirety of the allegedly uncontroverted facts, as well as the argument (Plf.Br. at 14–62) are directed at only one of the causes of action on which the plaintiffs seek summary judgment: tortious interference with contract. The argument in support of the remaining four claims (tortious interference with business expectancy, misappropriation of trade secrets, unfair competition, and breach of the confidentiality agreement) are then summarily advanced in the last five pages of the brief (Id. at 63–68). Following the defendants' response, the plaintiffs then support these remaining four claims with some 45 pages of argument in their

## Findings of Fact

In 1994, two Wichita hospitals, St. Francis and St. Joseph, announced their intention to merge into a single hospital system that would later become known as "Via Christi." The merger was announced with the intention to create a stronger, more efficient health care system which minimized costs. The proposed merger was "cleared" after an inquiry by the United States Department of Justice. The resulting Via Christi is the largest health care system in Kansas.

In addition to the merger, the Via Christi hospitals began employing physicians in order to integrate their health care delivery system. The plaintiffs contend that Via Christi "has been employing primary care physicians to secure referrals to that hospital." (Resp. Facts at 3). The evidence cited in support, however, establishes only that this was a concern of Wesley CEO Jim Kelly, who testified that Via Christi's hiring of its own physicians "certainly increased the likelihood" of more referrals to Via Christi. (Exh. 66 at 349). The plaintiffs have not produced evidence from any witness with personal knowledge of increased referrals.

Via Christi's advent significantly affected the market for health care in the area. Via Christi owns its own Health Maintenance Organization (HMO) product, Preferred Health Systems, Inc. The centerpiece of HMO managed care is the primary care physician "gatekeeper" who controls utilization of services by members. Family practice physicians are particularly well suited to provide gatekeeper services for managed care health plans. Vertical integration of hospitals allows Via Christi to offer "one stop shopping" for insurance companies and other third-party payors. The efficiencies

derived from physician integration can be obtained by physician-hospital affiliation, or through effectively managed physician groups. Physician groups and clinics unaffiliated with hospitals are an important source of competition to hospital-based outpatient services and hospital-based family practice physician services. The advent of managed care has forced many single practitioner physicians to join physician groups.

Columbia/HCA, which owns and operates over 350 hospitals, is the largest company of its type in the United States. The plaintiffs allege that, in 1996, Columbia/HCA was worth $4.4 billion, and earned $2.7 billion before taxes. The plaintiffs do not cite to any evidence for this assertion however, other than a reference to the report of their expert witness. The expert's report does not contain any reference to the source for these figures. The court notes that this sort of bootstrapping of factual, nonopinion evidence clearly fails to satisfy the rules of evidence.

Columbia/HCA acquired Wesley in 1994 when Columbia merged with HCA. Wesley has been very profitable. (Plf.Exh. 66, J. Kelly dep. at 22). At some point it was the most profitable hospital in the Columbia/HCA system. (Plf.Exh. 58, Dougan dep. at 96; Exh. 66, J. Kelly dep. at 22). On the other hand, there is evidence that, in terms of total profit margin, Wesley in 1996 was not even in the top ten hospitals in the Columbia/HCA system. (Plf.Exh.144). Wesley's profits grew from $56 million in 1994 to $89 million in 1996. Wesley has higher profit margins than its competitor Via Christi.[2]

Wichita Clinic, with approximately 150 physicians, is the largest multi-specialty physician group in Kansas. The shareholder owners of the Clinic also own Inte-

---

reply. (Plf. Reply at 52–97). This sort of pleading, which leaves virtually all of the argument until the reply brief, denying the non-movant any chance to respond, is not consistent with any proper rebuttal.

2. Plaintiffs allege that this higher degree of profitability is due to its high charges and

lower costs. (Plf.Resp. at 23, ¶ 141). But the same authority—plaintiffs' expert—elsewhere suggests that Wesley's profitability is simply because it "is a more efficient (lower cost) provider than Via Christi." (Plf.Exh. 137, at 22, ¶ 36).

grated Healthcare Systems, Inc. (IHS), a management service organization which provides the Clinic with administrative and support services. Wichita Clinic has spent over 20 years and millions of dollars to develop its primary care physician base.

The Clinic's 1994 Strategic Plan called for expanding Wichita Clinic's primary care physician base to 220 physicians by acquiring 75 primary physicians to create a physician-directed integrated delivery system. The plaintiffs claim that, at the time they were approached by defendants, "they were searching for other capital partners" among four entities (PhyCor, Humana, St. Joseph, and St. Francis). The evidence indicates, however, that Wichita Clinic had independently rejected PhyCor and Humana, while the Via Christi hospitals showed little real interest in such a partnership. Contrary to the argument of the plaintiffs, the Court finds the February 2, 1995 Letter of Intent[3] between the parties did not prohibit them from negotiating with other capital partners.

The relationship between plaintiffs Wichita Clinic and IHS has been memorialized in a Management Operating Agreement.[4] This agreement states that the relationship between Wichita Clinic and IHS "is that of independent contractors." (Def.Exh.4). IHS has the same officers and directors as Wichita Clinic. IHS's contract with Wichita Clinic is nonexclusive, but IHS has not attempted to contract with any physician group other than Wichita Clinic. There is some evidence

that its revenues were disrupted during the time period discussed herein, because one of its sources of revenue management fees was provided by Wichita Clinic.

In April 1994, St. Francis paid its primary care physicians more than Wichita Clinic. There was concern that these salaries would change the competitive level in the community. Later, Via Christi was establishing the market for primary care physician salaries.

The joint venture negotiations between Wesley and Wichita Clinic appear to have been motivated both by the desire to compete effectively with Via Christi and to maintain existing relationships with important insurance providers. It was in this context that Tom Kelly, Wichita Clinic's consultant, recommended that Wichita Clinic partner with a hospital to form an integrated health care system.

In April or May of 1994, John Knack, President and CEO for Blue Cross told Wesley CEO Jim Kelly that Blue Cross wanted to replace its existing exclusive hospital relationship with Wesley, which he characterized as "an older, aging product" with "more of a capitated arrangement." (Exh. 38, J. Kelly dep. at 95). Knack told Kelly that Blue Cross had unsuccessfully attempted to develop a relationship with Wichita Clinic, and had begun to talk to St. Francis about investing in their health maintenance organization. Knack told Kelly that he would give him the opportunity to try to develop a relationship with Wichita Clinic.[5]

---

3. See pp. 1173–1174, *infra.*

4. The Management and Operating Agreement provides that IHS, formerly Wichita Clinic Building Company, Inc., is owned by the physicians affiliated with the Clinic. IHS "is engaged in the business of owning and leasing buildings and equipment to the Clinic and managing professional medical practices." (Def.Exh. 4, at 1). The Agreement was created out of the desire of the Clinic and IHS "to create an integrated system that will provide increased efficiency, improved services to Wichita Clinic patients, and lower operating costs of the Clinic, as well as develop skills in providing managed care." (Id.)

5. Plaintiffs have stressed that Wesley was the only formal bidder for the Blue Cross hospital contract in 1992. There is no evidence, however, that Wesley will be the sole bidder on future Blue Cross contracts. There is evidence that Blue Cross was able to use the threat of contracting with other providers to negotiate steep discounts from Wesley.

The plaintiffs cite rough estimates performed by Todd Dougan which indicated that the loss of Blue Cross business could cost defendants $24 million in pretax earnings. In order to keep Blue Cross at Wesley exclusively, a deal to bring Wichita Clinic and Blue Cross together was imperative. It is uncontroverted that Wesley's strategy was defensive

Wesley approached Wichita Clinic with the idea of partnering in the development of a physician network in part as a response to the potential move of Blue Cross's business from Wesley to CorTech, the Via Christi company which owns HMO Preferred Plus of Kansas. In May or June of 1994, Kelly discussed with Rod Van Pelt, Wesley Chief Financial Officer, the potential for a joint venture or partnership between Wesley and Wichita Clinic. According to Wichita Clinic CEO Steven Perkins, the Clinic's officers also felt that "finding some method to link to or partner with others made sense." (Exh. 12, Perkins Dep. at 165).

Wesley, Blue Cross, and Wichita Clinic all believed that fee-for-service reimbursements would eventually be replaced by capitated fee arrangements. Each felt that a joint venture which integrated healthcare delivery in Wichita would create a "synergy" that would be a win-win proposition for all concerned.

It is uncontroverted that Blue Cross wanted both Wesley and Wichita Clinic to be a part of this integrated delivery system. Blue Cross intended to develop a new HMO, which would use as a hospital provider either Wesley or St. Francis. Plaintiffs suggest Blue Cross told Wesley that, without Wichita Clinic's participation, Blue Cross would terminate its exclusive relationship with Wesley, and begin negotiations with St. Francis. There is, however, no direct evidentiary support for such an ultimatum. It is uncontroverted that Blue Cross knew of Wesley's working relationship with Wichita Clinic, and asked Wesley to discuss the possibility of a managed care contract with the Clinic. It is also uncontroverted that Wesley understood its relationship could be adversely affected in the long term if it did not develop and implement managed care plans. As a part of its larger April 1995 "Business Acquisition Proposal," Wesley prepared an internal estimate of the losses which might arise if it lost its fee-for-service hospital contract with Blue Cross.

in that it sought to avoid a loss of Blue Cross's

On August 29, 1994, Wesley and the Wichita Clinic signed a Letter of Agreement "to form a relationship between Wesley Medical Center and Wichita Clinic," which provided that the parties would "negotiate in good faith to reach a definitive agreement." The plaintiffs agreed to provide tangible assets along with a management fee which the Clinic would pay to the joint entity. The defendants agreed that one of the terms of the joint venture would require them to make a capital/cash contribution equal to the value of Wichita Clinic's assets.

The agreement states: "A range of $30 to $36 million the parties agree is appropriate." (Def.Exh. 46 at ¶ 2.B). The agreement also provides that the amount Wesley would actually pay "will be determined by an independent appraisal of the value of the assets, net of liabilities," and that if the appraisal reached a figure outside the $30 to $36 million range, "either party may, at its discretion, terminate this agreement if it finds the value amount unacceptable." (Id.)

The agreement provided:

> The parties recognize the necessity of exchanging information which is confidential or contains business or trade secrets of the disclosing party. In consideration of this agreement, the negotiations hereunder, and the mutual exchange of such information, the parties do hereby agree to refrain from disclosing in any manner the information received from each other to any third party. The parties further agree to keep confidential the existence and nature of the negotiations hereunder and to refrain from any disclosure thereof to third parties.

(Def.Exh.44).

On November 9, 1994, Dr. Jim Greer, CEO of Wichita Clinic, wrote to Jim Kelly that the value of Wichita Clinic's contribution should be based upon the expected performance of the proposed joint venture over its initial three years of operations. (Exh. 47). Wichita Clinic's consultant,

business to Via Christi.

Tom Kelly, viewed the suggested $30–36 million valuation as a "take-it-or-leave-it" number.[6]  In the succeeding appraisal work, $30 million thus became a target figure.

Because of federal "fraud and abuse" regulations, Wesley could not contribute to the joint venture an amount in excess of the fair market value of the Wichita Clinic contribution.  A problem therefore arose when the defendants were never able to internally duplicate this valuation of Wichita Clinic's assets.  The defendants retained Ernst & Young to perform an independent valuation of the Clinic's contribution.  This retention was motivated in part by a concern that, if the defendants contributed more than the fair market value of the Clinic's assets, they could violate the federal fraud and abuse regulations noted above.

On December 12, 1994, Wichita Clinic wrote to Ernst & Young waiving any potential conflicts, and allowing the accounting firm to undertake its independent valuation.

The next day, Cynthia Dotson, the Vice President of Capital Management for Columbia, sent an e-mail to Jim Kelly indicating the fair market value of Wichita Clinic (though not the joint venture) was "in the range of $30 mm" based on the information provided by the Clinic.  She also wrote that Ernst & Young had "verbally corroborated" that number.  (Exh. 51).  Dotson makes an explicit distinction in her memo among "Fair Market Value, Enterprise Value and Investment Value."  Fair Market Value of the Clinic is "its worth ... to a buyer of the business[,] operating it as the owners now do."  It is under this measure, assuming the buyer were to take the Clinic free of all liabilities, that Dotson ascribes the "ballpark number" of $30 million.  In contrast, Investment value "is the key number" and is defined as "that amount we should be willing to invest given the deal structure and the total risks/rewards of the deal."  Dotson states that Ernst & Young's "rough ballpark number is $18 mm for the asset value if no debts were assumed."[7]

6.  In his deposition, Tom Kelly stated the 30 to 35 million dollar figure was "a take-it-or-leave-it number" unless Wesley "could convince us otherwise." (Def.Exh. 13, at 151). Kelly explicitly denied making a "considered evaluation of the Clinic." (Id. at 147). Asked about how he came up with the figure, Kelly testified:

I worked with the Clinic to decide and advised them as follows: That, one, the valuation techniques used in establishing the value of the Clinic were such that they could conceivably arrive at a range of values that were well beyond what they'd be willing to accept in terms of culminating a transaction; that they, like me, had ample experience and knowledge of pending and completed transactions in the market; that the real key to the value of the Clinic really was two items—one was the potential margin to be generated by the Clinic, and the second was the multiple that the purchaser was willing to attach to that potential margin; that both of those could be set in a reasonably finite way without the usual fanfare of valuations and without the usual confusion that resulted from competing valuations.

The reason that you can set a 30 to 35 million dollar value on this transaction is

we know the current size of the business, about $75 million a year; we know what a margin—what margin would be delivered, assuming a 3 or 4 percent margin parameter; we can choose a capitalization level; all without a more formal, more detailed, and probably far less useful valuation process.

. . . .

But the answer is, it wasn't meant as an estimate that the valuation was going to inform.  It was meant as a fundamental agreement that this business, and that the transaction value for this business, would be set based upon an agreed-upon multiple and an agreed-upon margin level well in advance of valuation procedures which were meant to benefit not either the Clinic or Wesley, but outside parties that might inspect the transaction.

(Id., at 148–50).

7.  Dotson's memo defines "Enterprise Value" as "what we can do together given the potential of IHS/Newco," and concludes "this value of hoped for earnings potential is not the key value which will determine what we should be willing to invest." (Def.Exh.51).

In a December 15 memorandum, Dotson wrote to Kelly that she "would be comfortable" with a $30 million capital contribution, plus or minus 15%. She stated that Ernst & Young "confirmed $30–$35 million as reasonable range comfort level in anticipation of getting a formal engagement to do a full valuation." (Exh. 52). This valuation, however, was subject to some explicit qualifications. Dotson cautioned that this value would be diminished by $6–8 million if the management fee to be paid by the Clinic was capped at 3%, and diminished by a further $6 million if the risk sharing pool was not properly defined and the predicted managed care savings were not obtained.[8]

Plaintiffs respond that Steve Davidson was unable to remember hearing any such confirmation from Ernst & Young. There is no showing that he was a party to all communications between Dotson and the accountants.

The December 15 informal valuation by Ernst & Young referred to by Dotson in the $30–35 million range included the assumption that the 3% cap on management fees was removed. The plaintiffs agreed to the removal of the cap.

The plaintiffs stress in their response that Ernst & Young provided valuations of only $13.5 to 18 million. But these valuations were tied to the problems relating to the assumption of debt and the cap on earnings. These were problems which plaintiffs knew about, and, as to the 3% cap, actually agreed to modify. (Dotson e-mail, Plf. Exh. 105). On December 14, 1994, Wichita Clinic agreed to remove the 3% cap, and provide that IHS's "net income would be the greater of actual earnings or 3% (post phase-in) of total operating revenue." (Plf.Exh.

139). Dotson received notice of this waiver of the 3% cap. (Plf.Exh. 106).

Davidson performed a final valuation analysis on January 5, 1995. He concluded that the value of the venture without debt was $17.9 million with the cap and $30.8 million without the cap.

On February 2, 1995, Wichita Clinic and the defendants signed a nonbinding Letter of Intent to create a joint venture which would create an integrated health care delivery system.[9] The agreement states that it is "not intended to be a binding agreement, [but] an expression made in good faith of our present intentions." (Plf.Exh. 25). The agreement explicitly restricted Wesley's ability to acquire or partner with other physician groups, requiring the hospital to "focus its efforts to build physician capacity through IHS and Clinic." (Def. Exh. 46, at ¶ 15). Conversely, the Letter of Intent did not prohibit Wichita Clinic from attempting to obtain other capital partners or obtaining capital for its 1994 "Strategic Plan." The 1994 Plan is not identified in the Letter of Intent, which speaks generally of an intent by the parties to "develop a plan" for Clinic expansion. Finally, the Letter of Intent expressly provided that the amount Wesley would pay would be determined by an independent appraisal, and that

> Upon review of the appraisal, either party may, at its discretion, terminate this agreement if it finds the valuation amount unacceptable. If the valuation is less than $30 million, the agreement may be terminated and WCBC, the Clinic and Wesley would have no further obligation hereunder.

(Plf.Exh. 25).

The Letter of Intent also provided that

> manage care at the hospital with us to create those savings, then another $6 mm of value is at risk.

(Def.Exh.52).

---

**8.** Dotson wrote:

> If the profits of the new company are shared disproportionately with the physicians, i.e., they keep all profits in excess of 3%, the value goes down by at least $6–8 million. If the risk-sharing pool concept does not get into the definitives per discussions yesterday, and/or if the doctors cannot

**9.** This Letter of Intent is a separate agreement from the Letter of Agreement signed August 29, 1994.

it is further understood and agreed that if either party determines for whatever reason to terminate further negotiations with the other party in respect of the Definitive Agreements referred to above, then there shall be no liability between us [as] a result of the execution of this letter....

(Id.)

During the negotiations, Wesley CEO Jim Kelly told negotiators for Wichita Clinic that they were "having difficulty coming up with that level of valuation." (Exh. 66, J. Kelly dep. at 459).

The agreements between the parties did not provide that the capital developed would be used to implement the Clinic's 1994 Strategic Plan. In addition the agreements did not prohibit the submission of additional terms or negotiations.

The same day, the parties held a joint press conference to announce the signing of the Letter of Intent. The press release stated that the parties had not completed "the financial arrangements." (Exh. 54).

After the Letter of Intent was signed, Jim Greer and Jim Kelly actively marketed the IHS concept to other physicians outside the Clinic. While some physician groups expressed interest, no outside physicians committed themselves to associating with the proposed joint venture.

On February 9, 1995, Ernst & Young representatives visited Wichita Clinic, and told its representatives that the 3% management fee cap was "quite restrictive," and that they would perform valuations with and without the cap. The first detailed, written valuation of Wichita Clinic's contribution was completed by Ernst & Young on March 31, 1995. This valuation was lower than the suggested $30–36 million range.

Shattuck Hammond, a firm hired by the Clinic to establish a valuation, performed a discount cash flow analysis which determined that the value of Wesley's contribution would be between $30 and 31 million. There is a fact dispute as to whether Ernst & Young was ever able to reach a comparable figure with the 3% cap included.

Notes made by Chuck Williams, Director Investment Analyst for Columbia/HCA's Asset Management Group, in March 1995 show an internal valuation of $10 to 20 million, but these notes also indicate that a "firm" number would need additional work but was "likely to happen." (Plf.Exh. 110). A memo written by Williams on April 11 expresses concern as to the risk pool assumptions underlying the IHS valuation. The memo also states: "This project appears to be very attractive from a conceptual standpoint, but significant work still needs to be performed before we can determine if the rate of return is acceptable." (Plf.Exh. 140).

On April 10, 1995, Steven Perkins and Frank Condon from Wichita Clinic met with Jim Kelly and Rod Van Pelt from Wesley, and Chuck Williams and Mike Ford from Columbia. Ford told Perkins and Condon that the joint venture would be finalized only when "mirror images of value" were reached by the two appraisers, Ernst & Young (employed by the defendants) and Shattuck Hammond (employed by the Clinic).

On April 17, Columbia/HCA and Wesley representatives met to discuss the progress of negotiations. This meeting resulted in a 12–point Addendum of talking points which addressed matters including the issues identified by Ernst & Young as reducing the valuation below the $30–36 million target. The issues related to valuation included defining the Clinic's "net revenues" for purposes of calculating the management fee, determining whether, if the Clinic was unable to pay the management fee, the fee would accrue and bear interest, and defining the percentages of the hospital and speciality risk pools that the proposed joint venture would receive. In addition, the Addendum proposed changes which would make IHS a limited liability corporation, give Wesley the right to independently acquire physician groups, give IHS the right to control capital expenditures by the Clinic and approve changes in physician compensation, and

provide for Wesley's capital contribution to be made over time. Although some of these issues had been raised previously, this was the first meeting in which they were discussed in detail. Contrary to an argument by plaintiffs, the evidence indicates that these issues were not presented by the defendants as "nonnegotiable" demands.

The plaintiffs contend that the Addendum reveals a secret strategy of acquiring the Clinic, and that the Addendum was a violation of the terms of the Letter of Intent. There is no evidence defendants planned to create their own primary care group until the end of the joint venture negotiations. The evidence cited by plaintiffs as illustrating a surreptitious acquisition strategy is equally supportive of the joint venture strategy which was publicly entered into by both parties. Thus, the Wesley Business Plan provides generally to "Integrate key physicians into network model." (Def.Exh. 359A). Similarly, in his notes from the meeting held in June, Perkins's notes speak simply of a "TOTAL JOINT VENTURE." (Plf.Exh. 120).

The plaintiffs also rely on their Exh. 107, notes of a December 19, 1995 meeting, in which Chuck Williams wrote that "They won't sell FP's separately." (Plf.Exh. 107). But this comment, clearly placed in the future tense, was six months after termination of the joint venture negotiations, and it simply reflects a rejection of an acquisition at the time of the meeting. It does not indicate that Wesley was insisting on an acquisition in July. Importantly, this meeting occurred after Kelly had written to the Wichita Clinic board in October proposing—for the first time—purchasing an equity interest in Wichita Clinic, and Wichita Clinic had responded *positively*.

It is true that the Letter of Intent did not include a "right of first refusal clause" giving Wesley the right to acquire physician practices as there was in the subsequent Addendum, but neither was there any provision excluding such a right. Moreover, the Letter of Intent was clearly subject to additional negotiations.

The plaintiffs' contention that the alterations reflected in the Addendum were radical departures, not advanced as good faith proposals, from the Letter of Intent is not supported by the evidence. For some of the proposed modifications, such as a change of IHS to a Limited Liability Corporation, the control by IHS of capital expenditures, or IHS approval of changes in services by the Clinic, plaintiffs have completely failed to provide proof that the changes fundamentally altered the proposed joint venture. The other proposals—beyond the proposal to add a right of first refusal for Wesley to acquire physician groups—complete or supplement terms of the Letter of Intent; they in no way demonstrate a bad faith attempt by defendants to modify the core of the proposed joint venture. The right of first refusal would modify the Letter of Intent by allowing Wesley to combine with five specified physician groups, but it would also serve to harmonize the explicit goal in the Letter of Intent of Clinic expansion and adding physician specialists, with an otherwise blanket ability by Wichita Clinic to prevent these goals.

It is uncontroverted that Wesley knew the issue of valuation was very important to the Clinic. (Plf. Exh. 66, Kelly dep. at 459). Equally, the Clinic knew that Wesley could not live with the exclusivity provisions in the Letter of Intent. (Plf.Exh. 81). Neither party has produced evidence the other was acting in bad faith.

By April 21, 1995, Bank IV had approved IHS for a $1.8 million line of credit to invest in Premier Blue, the new HMO product from Blue Cross.

The April 1995 Proposal requested $900,000 to purchase an equity interest in Premier Blue. The stated purpose of the proposal was to "[h]elp maintain exclusivity with Blue Cross business." (Exh. 43, Dep.Exh. 200). Once IHS was formed, the investment was to be "transferred to IHS as part of initial contribution." (Id.)

On April 25, 1995, Harvey Sorensen, Wichita Clinic's attorney, wrote to Joe So-

well, outside counsel for the defendants, enclosing a copy of Shattuck Hammond's valuation with the comment it "should assist you in preparing the additional term sheet you are working on." (Exh. 63). Sorensen noted that Shattuck Hammond concluded the Letter of Intent might be subject to "further clarification and negotiation" and that Sections 7 and 8 of the Letter of Intent were "inconsistent." (Id.)

On May 4, 1995, Sorensen wrote to Sowell asking when the Clinic would receive the defendants' "list of issues/m odification/changes." (Exh. 64).

On May 9, Jim Kelly presented the Clinic with the 12–point additional term sheet, entitled "Addendum." According to Jim Kelly and Van Pelt, the Addendum was intended to be a set of talking points for additional discussion. In addressing the IHS Board of Directors on May 9, Kelly stated that the defendants wanted to move forward with the joint venture. Sorensen saw the proposed changes as an attempt by Wesley to gain control of the Clinic. Dr. Greer also saw the Addendum making significant changes in the proposed form of the joint venture, but was nonetheless a "good faith" attempt by Wesley to work out unresolved issues. (Exh. 66, Greer dep. at 371–72).

Wichita Clinic rejected the terms of the Addendum in a letter of May 18, 1995, stating that under its terms the resulting partnership would be materially different from that provided under the Letter of Intent.

Jim Kelly responded the same day by stating that the defendants were willing to do the joint venture, and return to the terms of the Letter of Intent. Kelly wrote: "I believe that through our continued dialogue we will achieve our shared vision—a truly integrated delivery system focused on improving the health of the communities we serve." (Exh. 68). Wesley and Columbia/HCA intended to consummate the joint venture if an independent valuation of the Wichita Clinic contribution could be obtained and the remaining details could be worked out.

Wichita Clinic was informed that Columbia/HCA was having trouble internally verifying the $30–36 million valuation, and it was because of this difficulty that Columbia/HCA's negotiators asked for, and obtained, language in the Letter of Intent permitting either party to terminate the arrangement if the valuations were unsatisfactory. Wichita Clinic knew by December 1994 that the defendants were having trouble with the valuation. (Plf. Exh. 15, Perkins Aff. at ¶ 15).

Julie Deterding is a financial analyst at Wesley. She has worked at Wesley since 1988. She assisted Kelly and Van Pelt in the joint venture negotiations. Deterding testified that she understood Wesley's investment in the joint venture "had been estimated around $30,000,000." (Plf. Exh. 57, Deterding dep. at 25–26).

According to the testimony of Kelly, Van Pelt, and Deterding, at no time during the joint venture negotiations between late 1994 to mid–1995 did anyone at Wesley have plans to create a primary care physician group at Wesley which would employ physicians directly. Steen, Central Group President of Columbia/HCA, James "Denny" Shelton, and Morgan have testified that no one at Columbia/HCA had such plans. It is uncontroverted that such a policy was discussed only after the joint venture negotiations ended.

On or around May 18, 1995, Steve Perkins and Frank Cordon of Wichita Clinic met with John Knack of Blue Cross, at the suggestion of the Wichita Clinic Board of Directors, to discuss "the enhancement" of their relationship (Exh. 69). Wichita Clinic did not tell the defendants of this meeting, and asked Blue Cross to keep it "very confidential." During this time, the Clinic continued to negotiate with Wesley. Wichita Clinic and Wesley had agreed to conduct all negotiations with Blue Cross jointly. (Exh. 44).

Perkins and Cordon told Knack that the Clinic had "some disagreements" with the defendants which "endanger[ed]" the joint venture. (Id.) Perkins later wrote a memo

relating to this meeting, stating he and Cordon had

> very confidentially shared with him the fact that we had some disagreements which could in fact endanger our agreement with Wesley. We emphasized to him our interest in participating with Premier Blue. We also floated out the concept that if we were not able to come to terms with Wesley, whether Blue Cross–Blue Shield would have an interest in making a minority investment in IHS, Inc. He did express a real interest in this.... We made it very clear that we wanted to work with them and wanted to see Premier Blue highly successful in the future. He noted that he would be keeping this quiet, visiting only with the President, Tom Miller and his legal counsel.

(Def.Exh. 69). Perkins and Cordon emphasized the Clinic's interest in participating in Premier Blue, and asked if Blue Cross was interested in investing in IHS. Knack expressed interest in such an investment. Previously, Wesley and Wichita Clinic had contemplated splitting a 20% investment in Premier Blue.[10] On or before April 7, 1995, prior to the end of negotiations with Wesley, the Clinic told Blue Cross that it wanted to take "a full 20% ownership in Premier Blue" for itself. (Exh. 69).

Wesley tendered the renewal of its Blue Cross hospital provider contract on May 25, 1995. Blue Cross accepted Wesley's offer and signed the renewal on June 1, 1995. Wichita Clinic had tendered an offer to become a physician provider contractor to Premier Blue HMO on March 31, 1995. This offer ultimately would be accepted by Premier Blue on August 22, 1995.

Wichita Clinic continued to negotiate the joint venture with Wesley into June. (Exh. 70). On May 30, the parties met to discuss Shattuck Hammond's valuation report. The parties met again on June 5. At the latter meeting, George Morgan of Columbia/HCA stated that there existed potential conflicts of interest between Wesley and the joint venture, such as the exclusivity provisions in the Letter of Intent and the possible uses of Wesley's capital contribution. According to Morgan, the exclusivity clause appeared to prevent Wesley from working with physicians not affiliated with IHS and that Wesley could not afford to give up its pre-existing relationships with these physician groups. Morgan proposed that these potential conflicts of interest could be resolved by combining the assets of Wesley and the Clinic into a single joint venture.

The plaintiffs claim defendants' alleged fraud was revealed by June 1995. Plaintiffs have also claimed lost profits for fraud during 1995.

The plaintiffs formally terminated negotiations in a letter of June 28, 1995. In this letter, Dr. Greer wrote:

> The philosophies of our respective organizations are deeply ingrained in each of our cultures, and we have reluctantly come to the conclusion that these philosophies will not produce synergy in IHS and, thus, are not compatible. Consequently, it is with regret that we terminate further discussion *at the present time* regarding IHS and Wesley Medical Center. We expect to continue to work with you in several areas and trust that our relationship will continue to grow. It is certainly our desire to continue to pursue mutual interests with Wesley Medical Center.

---

10. The plaintiffs suggest that Wesley had already disavowed any interest in investing in Premier Blue, and that it lacked the ability to make such an investment. But the cited evidence for the former, the testimony of Knack, is uncertain as to the time of this alleged disavowal, whether it was before or after the collapse of negotiations between Wichita Clinic and Wesley. As to the latter, Jim Kelly explicitly testified that Wesley was willing and able to make such an investment. The evidence which is offered to controvert this only suggests that Wesley might suffer a delay in making such an investment, not that it was barred from doing so.

(Def.Exh. 77) (emphasis in original). The letter does not make any suggestion of bad faith negotiations by Columbia/HCA or Wesley. Greer has testified that he used the phrase "at the present time" in the letter because he did not want to "close the door" on Wesley. (Exh. 66, Greer dep. at 410). Greer continued (at least until his July 31 resignation) to attempt to maintain a positive relationship with Wesley. (Id.)

As noted earlier, Wichita Clinic's offer to join Premier Blue was accepted on August 22, 1995. IHS signed the shareholder agreement of Premier Blue on August 17, agreeing to buy 10% of the Blue Cross subsidiary which owned Premier Blue. The Shareholder Agreement provides in part:

Notwithstanding any other provision contained herein, in lieu of performance as provided in ¶ 2.1, Blue Cross may, upon written agreement by [IHS], at any time sell stock Blue Cross acquires pursuant to ¶ 2.1, plus 300,000 additional shares owned by Blue Cross, to [Wesley] or another hospital or hospitals located in Sedgwick County, Kansas.

(Def.Exh. 82, § 2.3). Thus, without the written consent of IHS, Blue Cross could not sell any Premier Blue stock to Wesley.

The Letter of Agreement which had been entered into by the parties on August 29, 1994, limited the ability of Wesley and Wichita Clinic to create links with "a health care management company [or] an integrated delivery system," by providing that the parties to the agreement would "refrain from negotiating for the formation of either ... with a third party." (Def.Exh. 44).

On October 31, 1995, Jim Kelly wrote to Tom Peters, the President of Wichita Clinic's Board of Directors, expressing an interest in buying part of the Clinic. This was the first time Wesley had expressed a direct intent to purchase an equity interest in Wichita Clinic.[11] Peters responded in a November 8 letter, which expressed receptiveness to the idea. Peters also asked "whether or not the joint venture concept remains an option?" (Def.Exh. 79).

In their motion, the plaintiffs cite Kelly's October 31 letter as relevant to the issue of misappropriation of trade secrets and misuse of confidential information, stressing that Kelly requested information which included financial documents, physician productivity, and physician compensation. (Plf.Exh. 22). There is nothing in the letter, however, to indicate that Kelly sought to acquire the information for purposes of directly hiring Wichita Clinic physicians. Rather, the letter proposed the idea of acquiring an equity interest in the Clinic. Kelly wrote:

After careful consideration and discussion, Wesley Medical Center would very much like to *begin discussions* with your Board about the *possible acquisition* of the Wichita Clinic by Wesley Medical Center.

In order to facilitate the development of an offer to acquire the Wichita Clinic, we will need to conduct a document review. I have enclosed a list of documents and a signed Agreement for Non-Disclosure of Confidential Information statement for your review.

Tom, it is our hope to develop more than one *option* for the Board to consider in a timely manner.

(Id.) (emphasis added). By its terms, the letter dealt only with a hypothetical purchase of the Clinic. Moreover, it is uncontroverted that the plaintiffs refused the request for the information.

Plaintiffs also cite a November 6 memo from Chuck Williams to Jim Kelly as evi-

---

11. The plaintiffs seek to characterize Morgan's comments at the June 5 meeting as an expression of an intent to gain "full acquisition" of the Clinic. (Plf. Resp. at 130, ¶ 213). There is no evidentiary support for such a conclusion. Indeed, Perkins' deposition testimony is directly inconsistent with the attempted portrait of Morgan's comments as reflecting an attempt by Wesley to "acquire" the Clinic. Rather, Perkins states that Morgan simply proposed a "combining of all of the assets and liabilities" into the joint venture, with "the physicians taking some sort of an ownership in the hospital organization." (Def. Exh. 186, Perkins dep. at 476–77).

dence of wrongful use of confidential information. In the memo, Williams noted the Clinic had refused to supply the requested information relating to the proposed acquisition, and that in formulating a proposal the financial status of the Clinic was important but "even more crucial is the information related to individual physician productivity and compensation." (Plf.Exh.23). As with the earlier letter by Kelly, the Williams memo is explicitly directed at buying the Clinic, rather than hiring away some of its physicians. The memo does contain, in one paragraph, a mention of hiring Clinic physicians—and ultimately concludes that it would be "better to buy them from the Clinic rather than hire them." (Id.) In addition, there is no indication in the memo that, in reaching this conclusion, Williams was using confidential information acquired during the joint venture negotiations. Rather, the memo indicates that Williams' calculations were based on employing 28 family practitioners "and assuming median activity according to MGMA." (Id.)

James Kelly has stated that, in signing the Letter of Agreement, it was his intention to honor all of the terms of the agreement. On behalf of Wesley, Kelly and Van Pelt communicated the company's desire to partner with Wichita Clinic to form an integrated health care delivery system. Shelton and Steen also worked toward creating a co-managed, co-governed integrated health care delivery system. Kelly and Van Pelt have stated that at no time during the joint venture negotiations did they want to acquire Wichita Clinic or control and dominate the proposed joint venture. It is uncontroverted that Kelly, Van Pelt, Shelton, Steen and Morgan used their best

efforts in seeking to make the proposed joint venture a success.

Both Perkins and Greer have testified in their depositions they believed the defendants acted in good faith during the negotiations. Similarly, John Knack of Blue Cross never questioned that Wesley was acting in good faith in its joint venture negotiations with Wichita Clinic.[12]

Wesley did not begin to recruit primary care physicians until the fall of 1995. It first held open meetings attended by many area physicians. The only restriction on the physicians which Wesley targeted for potential employment was that the physicians have admitting privileges with Wesley, a restriction of minimal impact since this includes some 300 physicians in the Wichita area.

On October 11, 1995, agents of Columbia/HCA and Wesley met with primary care physicians to discuss the formation of a primary care group at Wesley.

In January 1996, Wesley became part of Columbia/HCA's Midwest Division, which was headed by President Kevin Gross. Jim Kelly of Wesley then reported directly to Gross.

The decision for Wesley to hire physicians directly was a response to a similar action by Via Christi. Wesley did not hire primary care physicians to increase its outpatient services, but to forestall Via Christi from increasing its market share of inpatient hospital services.

Wesley recruited physicians from several sources, including Wichita Clinic.

Neither Wichita Clinic Building Company nor IHS signed the Letter of Agreement, or is mentioned in it. Neither

---

12. As one of their uncontroverted facts, plaintiffs assert that in the fall of 1995 Columbia/HCA Chief Operating Officer David Vandewater summoned Wesley's Chief Executive Officer, Jim Kelly, to Nashville. Vandewater told Kelly the hospital wasn't as profitable as they wanted, even though it had met all the goals previously set. According to Kelly, "they wanted Wesley to be the first hundred-million-dollar earning hospital in the country." (Kelly dep. at 63–64). The plaintiffs bring forth this incident in the context of their discussion of an alleged motive of Wesley to purchase the Clinic rather than partner with it, and thus that their negotiations were conducted in bad faith. Significantly, however, the evidence relates to the fall of 1995—after Wichita Clinic had rejected continuing negotiations concerning the joint venture.

company signed the subsequent Letter of Intent.

The uncontroverted facts demonstrate that the defendants did not use any confidential information to hire physicians. According to the testimony of Charles Williams, information obtained from Wichita Clinic was used solely to determine the feasibility and desirability of creating a joint venture with Wichita Clinic and establish an integrated delivery system. This included using some of the information to appraise the value of Wichita Clinic's contribution. While the joint venture negotiations were proceeding, Wesley did not attempt to contact physicians outside the proposed joint venture. No one at Wesley or Columbia/HCA considered an acquisition of Wichita Clinic before August of 1995. Such a course was considered only after the collapse of the joint venture negotiations.

It is uncontroverted that, during the course of the joint venture negotiations, Wichita Clinic provided to the defendants financial information relating to the Clinic, including balance sheets, financial statements, and revenue projections. (Plf.Uncontr. Fact ¶ 14). It is controverted, however, whether this information was deemed confidential or constituted a trade secret. The evidence cited by plaintiffs in support of this latter conclusion reflects only the legal conclusions of Wichita Clinic personnel. The plaintiffs also cite the confidentiality agreement as necessarily providing that any information produced pursuant to the Letter of Intent would be considered confidential or a trade secret. This misreads the agreement between the parties. As noted earlier, the agreement provided only:

> The parties recognize the necessity of exchanging information which is confidential or contains business or trade secrets of the disclosing party. In consideration of this agreement, the negotiations hereunder, and the mutual exchange of such information, the parties do hereby agree to refrain from disclosing in any manner the information received from each other to any third party. The parties further agree to keep confidential the existence and nature of the negotiations hereunder and to refrain from any disclosure thereof to third parties.

(Plf.Exh.24). The agreement restricts the ability of any party from "disclosing" information received from the other party; it does not provide that all information exchanged would be considered "confidential or contain[ing] business or trade secrets."

In addition, a fact question exists whether the plaintiffs actually treated the financial information identified in Plaintiffs' Uncontr. Fact ¶ 14 as privileged information. The defendants have submitted evidence indicating that Wichita Clinic had no written policy restricting the use of financial information, that the plaintiffs failed to identify any such policies in response to discovery requests, and that policies regarding confidentiality applied only to patient information, medical records, and personnel records.

The uncontroverted facts also establish that the defendants were aware of the existence of the confidentiality agreement. (Plf.Uncontr. Fact ¶ 15). The assertion by plaintiffs, however, that defendants necessarily were aware that the financial information was confidential under the agreement of August 23, 1994 is not supported by the cited evidence. The evidence establishes that the named agents of the defendants knew of the agreement, not that the information was either confidential or a trade secret. In addition, there is evidence that the Clinic's physicians were not subject to confidentiality requirements, and that they were not told that Clinic financial information was confidential.

The plaintiffs assert that the defendants knowingly used confidential or trade secret information in a November 17, 1995 memorandum projecting potential profits or losses, and in a December 20, 1995 memorandum discussing "PHYSICIAN STRATEGY." (Plf. Exh's 27, 32). The evidence is not clearly established, however, that the November memorandum was

devoted solely to hiring physicians from Wichita Clinic, as opposed to formulating a proposal to purchase the Clinic, or that the information used—physician-patient encounters—was actually confidential in nature. Similarly, it is disputed whether the information contained in the December memo was confidential. Moreover, this memo appears to be directed, not at any plan to hire Wichita Clinic physicians, but at "offering employment to all of the family practitioners on the Wesley staff." (Exh. 32).

There is no allegation of any *disclosure of any trade secret to a third party* or of any *use of confidential information.* As to confidential information, the agreement only prohibits the *disclosure* of such information. Wichita Clinic has not identified any specific confidentiality agreement between itself and either Wichita Clinic Building Company or IHS.

In interrogatories, the plaintiffs were specifically asked to whom the defendants improperly disclosed confidential information. The only third party identified by the plaintiffs as receiving confidential information was Mid States Diagnostics, on the basis of a single letter. It appears uncontroverted that this letter did not reveal any information not known to the recipient, Robert Kozicki of Mid States Diagnostics. There is no evidence this letter adversely affected plaintiffs' relationship with Mid States Diagnostics. The letter was sent January 9, 1995, and states that Wesley was conducting joint venture negotiations with Wichita Clinic. According to Kozicki, the negotiations between Wichita Clinic and Wesley were "common knowledge in Wichita Medical Community." (Def.Exh.110). The letter was also sent after a January 1, 1995 *Wichita Eagle* article which quoted Perkins of Wichita Clinic as acknowledging that the two companies "had held discussions." (Def.Exh.114) A copy of the letter was in fact sent to the plaintiffs' representatives

Greer and Perkins, neither of whom expressed any contemporaneous objection to the letter as a revelation of trade secrets.

In their motion for summary judgment, the plaintiffs argue that the defendants revealed confidential information to third parties, but the cited exhibits (Plf. Exh's 23, 27, 29, 34, 50, 51) do not establish that the information was in fact confidential in nature. The plaintiffs allege that the defendants revealed confidential information to Larry Meyer, who was hired as a consultant to consider proposed physician employment strategies. The requested findings of fact cannot be accepted, however, since (1) it is contrary to plaintiffs' responses to interrogatories, which identified only Mid States Diagnostics as a recipient of confidential information, and (2) Meyer expressly states in his deposition that he did not see any Wichita Clinic data in performing the work he was asked to accomplish.

As noted earlier, HCA created a new primary care physician group in 1996, and began to recruit and hire primary care physicians throughout the Wichita area. According to the defendants, this program was a response to the integrated delivery system previously implemented by Via Christi. The plaintiffs characterize the defendants' motives as less benign, as a part of a merger and acquisition strategy with the goal of "dominating" the Wichita market. The cited evidence (Exh. 159) does not support the plaintiffs' contention. The evidence does indicate that the defendants did assume an "incremental increase in ... referrals to Wesley [of] 25 or 30 percent." (Exh; 58, at 62).[13]

Wesley recruited physicians from the approximately 300 physicians throughout the Wichita area who had staff privileges with the hospital. Some physicians were extended offers which were not accepted.

Wichita Clinic employed about 50 primary care physicians in early 1996. Wes-

---

**13.** In his deposition, Dougan testified he did make "an assumption" there would be an "incremental increase" in referrals to Wesley

between 25 and 30%. (Exh. 58, at 62). There is no evidence Wesley worked to pressure such results or to "leverage" them.

ley extended offers to each of the Clinic's family practice physicians, along with other primary care physicians not associated with the Clinic.

In 1996, thirteen primary care physicians resigned from the Wichita Clinic to join Wesley's new physician group. These thirteen physicians joined fourteen other primary care physicians, who were not previously affiliated with the Clinic, who also joined with Wesley in 1996. Of the thirteen former Clinic physicians, eleven are employed by Wesley in Sedgwick County. Wesley agreed to pay these physicians' liquidated damages to the Clinic.

The thirteen physicians began terminating their relationship with Wichita Clinic in June, July, and August of 1996. In September of 1996, Wichita Clinic sued Columbia/HCA to enjoin them from alleged predatory conduct.

It is uncontroverted that Wichita Clinic's loss of the thirteen physicians had a substantial negative impact on the Clinic. The magnitude of those losses is open to question. Plaintiffs assert that Wichita Clinic specialists have seen their referrals "substantially diminished." (Plf.Resp. at 15, ¶ 91). The witnesses whose testimony is cited for this statement, Drs. Taylor and Odenheimer, appear unsupportive. Dr. Taylor admitted he "had no sense" of the number of referrals he lost, that "I don't have figures," and that his impression was based on what he had been "hearing antidotally [sic]." (Plf.Exh. 77, Taylor Dep. at 21). Dr. Odenheimer attributed the decline in his overall referrals to a drop-off in referrals from Via Christi physicians, not the Wesley network. (Plf.Exh. 20, Odenheimer dep. at 9)

Wichita Clinic also contends that Wichita Clinic was damaged, because, when it altered its compensation formula after the departure of the 13 primary care physicians, this caused its cardiologists to leave the Clinic. There is no direct evidence cited by plaintiffs that this was the reason for the departure. Dr. Zepick, one of the departing cardiologists, attributed the departure to a wide variety of factors without mentioning the change in the Clinic compensation system. (Def.Exh. 220, Zepick dep. at 24–26).

During their employment with Wichita Clinic, and prior to their later employment by Wesley, Drs. Johnson, Holmes, Hartley, Ernst, Enoch, Butler, Basham, Brunner, Brown and Koehler never signed any confidentiality agreements with Wichita Clinic, Wichita Clinic Building Company, or IHS. The doctors were only subject to confidentiality restrictions on patient information and to comply with "operational rules" of the Clinic. The plaintiffs have provided no evidence consistent with D.Kan. Rule 56.1 which would support a finding that the physicians were contractually bound to protect plaintiffs' alleged trade secrets. No one from Wichita Clinic ever told these physicians, either verbally or in writing, that their compensation and productivity information was confidential.[14] They were not aware of any attempts by Wichita Clinic to suggest such information was confidential; they were free to ask other physicians about their compensation and productivity. These physicians have each testified they believed they could freely disclose their compensation and productivity information to whomever they chose.

The physicians believed their employment contract was between themselves and Wichita Clinic only. They were never told that their contracts were intended to benefit Wichita Clinic Building Company. The doctors understood that under their employment contracts if they left the employment of Wichita Clinic, they could either refrain from practicing in Sedgwick County for three years, or pay 25% of their earnings over three years as liqui-

---

**14.** Plaintiffs attempt to dispute this fact, arguing that the doctors were only informed of their compensation information, but the evidence relied on (an affidavit from Perkins) is both inconsistent with his previously sworn testimony and with plaintiffs' argument, since it states that the physicians were also given productivity information.

dated damages (15% in the case of two of the physicians). The doctors have stated that they understood that, if they left Wichita Clinic and stayed in Sedgwick County, they would fulfill their contractual obligations by paying the required percentage of their earnings.

The noncompete clause in the employment contract created a significant disincentive for physicians to leave Wichita Clinic. It was not financially viable for the physicians to move their practices outside of Sedgwick County because they would lose their patients. If they practiced in Sedgwick County, they would have to pay the liquidated damages. As a practical matter, the physicians were thus not able to leave Wichita Clinic and practice in Sedgwick County without finding an employer willing to pay the liquidated damages.

Other than their own compensation and productivity information, the departing physicians did not thereafter use any Clinic financial records, patient lists, or physician compensation information. Wichita Clinic sent post-departure announcements to their patients stating that Wichita Clinic had other physicians who could provide treatment. One physician notified his patients of his change of practice. Some patients chose to stay with the departing physicians, and had their medical records transferred to Wesley.

Prior to September of 1995, no one had contacted Drs. Butler, Enoch, Johnson, Holmes, Brunner, Bassham, Hartley, Ernst, Koehler, Brown, Mosier, or Eglehof about working for Wesley. Indeed, they had not heard that Wesley was considering hiring physicians.

While they worked at Wichita Clinic, it was their custom to refer patients both to specialists employed by Wichita Clinic and to outside specialists. After their departure, the physicians continued to make referrals to Wichita Clinic specialists, although the number of referrals declined by some unquantified amount. The physicians have testified that their referral decisions are governed by the patients' interests, taking into account matters such as insurance, geography, and patient preference.

It is uncontroverted that no one at Wesley or Columbia/HCA pressured or encouraged any of these physicians to change their referral patterns. Referral decisions are based upon the independent professional judgment of the physicians. The employment agreements between the physicians and Wesley provide autonomy to the physicians in making decisions regarding patient care. The agreements provide that the physician "shall have complete control over the diagnosis and treatment of patients." (Def.Exh.87).

Plaintiffs have submitted an exhibit (Plf.Exh.35), showing a table of Wesley's referral income from each primary care physician for 1995 and 1997, with the percentage increase for each physician, as support for their contention that referrals from the departing physicians have markedly increased referrals to Wesley. Defendants object to the exhibit as a creation of counsel lacking in foundation. The information underlying this exhibit is taken from a response to an interrogatory by Wesley, which provided information not only as to the two years cited in Plf.Exh. 35, but also for the years 1994 and 1996. This information is shown in the following table.

| Physician | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|
| Bassham | $ 90,018 | $ 50,714 | $187,753 | $334,641 |
| Brown | 407,155 | 292,021 | 606,901 | 850,812 |
| Brunner | 19,969 | 142,033 | 620,981 | 401,364 |
| Butler | 31,803 | 164,419 | 173,537 | 379,420 |
| Egelhof | 78,970 | 97,033 | 554,192 | 566,245 |
| Enoch | 146,318 | 332,713 | 214,692 | 318,682 |
| Ernst | 34,772 | 108,761 | 183,786 | 277,525 |
| Hartley | 179,365 | 170,023 | 246,661 | 362,234 |
| Holmes | 314,668 | 134,080 | 543,656 | 598,012 |
| Johnson | 71,393 | 72,096 | 148,997 | 256,263 |
| Koehler | 135,969 | 109,183 | 105,757 | 454,804 |
| Mosier | 262,973 | 209,166 | 243,561 | 305,738 |
| Svoboda | 0 | 7,789 | 0 | 32 |

Generally, this additional information also supports plaintiffs' broad contention that Wesley enjoyed an increase in referral income from the departing physicians, although, for a few physicians there are actually decreases in referral income during some years.

The usefulness of the information contained in the table is also limited. It does not measure the percentage of referrals to Wesley or the number of patients seen by the physician. It would be unusual if, as the career of a physician progresses, she would not see an increasing patient base and thus naturally produce more and more referrals to specialists. There are several additional limitations apparent in the evidence. Wesley has stated that it does not track individual referrals, and Wichita Clinic has stated that it "maintains no records from which you can track referrals and measure decreases." (Def.Exh. 206, Allen dep. at 139).

While the physicians were employed at Wichita Clinic, it was their custom and practice to admit patients to Wesley and Via Christi. After joining Wesley, the physicians have continued to admit patients to both hospitals. Plaintiffs have attempted to controvert this fact, but have submitted no evidence showing admissions to Via Christi have ceased or declined. No one has attempted to pressure the physicians to admit patients to Wesley. Their employment agreements with Wesley allow them to exercise admission privileges with any hospital in Wichita.

The physicians have testified that, by 1994, they knew they were being paid much less at Wichita Clinic than other primary care physicians were being paid by other major employers such as Via Christi. The plaintiffs attempt to controvert this point by stating that the physicians' salaries were adjusted in 1994 and 1995 "to reflect market conditions and rates." (Plf.Resp. at 138, ¶ 261). This may have been the motivation for salary increases in 1994 and 1995, but it does not alter the fact that in 1994 the physicians who would later leave Wichita Clinic were paid much less than other physicians employed by major employers. Via Christi's base salary was $150,000.

In contrast, and contrary to the conclusory suggestion of plaintiffs, it is apparent that Wichita Clinic was not providing compensation comparable with the market leader, Via Christi. Nine of the physicians who left Wichita Clinic were making less than $125,000. In 1995, only one of the 26 Wichita Clinic family practice physicians had a base salary of $150,000 or more. It is uncontroverted that the physicians who left Wichita Clinic believed that the Clinic was unwilling to adjust their compensation to competitive levels, and this played a major role in their decisions to leave.

These thirteen physicians had existing employment agreements with the Wichita Clinic which contained covenants not to compete. The agreements provided that, upon leaving employment, the physician would not "for a period of three (3) years thereafter, directly or indirectly engage in the practice of DOCTOR's profession in Sedgwick County, Kansas." Columbia/HCA and Wesley knew of these employment contracts, and the noncompete provisions. In employing the thirteen physicians, the defendants agreed to pay the liquidated damages specified in the employment agreements.

As a result of the departure of the 13 physicians, the Clinic lost revenue from referrals to Wichita Clinic specialists. The uncontroverted evidence does not clearly establish, however, the extent of the actual damages experienced by the Clinic. In addition to agreeing to pay liquidated damages, the defendants also agreed to pay the former Wichita Clinic doctors compensation which generally exceeded their prior salaries.

The Wichita Clinic employment contracts were terminable upon 30 days notice. Each of the Wichita Clinic physicians subsequently employed by Wesley provided the requisite notice.

The liquidated damages provision in the employment contracts was designed to compensate Wichita Clinic for costs associated with the loss of a physician. Wichita Clinic believes it incurs a net cost of $230,000 for the first three years after hiring a new family practice physician. According to Professor Butler, the Clinic's liquidated damages formula would result in a recov-

ery of approximately $225,000, assuming the physician makes the medial gross revenue of $300,000.

On December 30, 1997, the defendants paid the first of three liquidated damages payments, totaling some $659,939.65, to Wichita Clinic on behalf of the thirteen former Wichita Clinic physicians. A second installment, in the amount of $686,-828.35, was paid to Wichita Clinic on August 3, 1998.

The defendants cite litigation which arose after the departure of five Wichita Clinic cardiologists in 1996 to form Kansas Cardiology Associates. The cardiologists eventually paid Wichita Clinic liquidated damages, but sued the Clinic for a determination of the term "all earnings" as it was used in the noncompete clauses in their employment agreements. Wichita Clinic counterclaimed for misappropriation of trade secrets, breach of loyalty, tortious interference with prospective business relations, breach of contract and defamation. The breach of contract claim was predicated on the cardiologists' failure to pay liquidated damages, not their practice of medicine in Sedgwick County. Steve Perkins testified that the cardiologists' payment of liquidated damages "satisfied that aspect of their contractual obligations." (Exh. 83, Perkins dep. at 350).

Wichita Clinic Building Company and IHS were not participants in the litigation. IHS subsequently responded to an interrogatory by the defendants that it had not brought any claim against the renegade cardiologists "[b]ecause the physicians bringing suit in this case satisfied their contractual obligations to the Clinic." (Def.Exh.37).

The plaintiffs contend that a key element of the defendants' operations was the ability to "leverage" increased referrals. The assertion contained in the plaintiffs' statement of facts is supported only by conclusory opinion. There is no evidence Wesley monitored or controlled the physicians' decisions regarding referrals. The evidence does not support any conclusion that the alleged "leverage" has indeed re-

sulted in Wesley's increasing its market share of hospital services. The plaintiffs have not shown Wesley's salaries are markedly in excess of Wesley's economic return. To the contrary, it is uncontroverted that vertical integration increased economic efficiency.

The plaintiffs correctly assert that the defendants prepared calculations showing some initial losses from the hiring of the thirteen former Wichita Clinic physicians. However, whether Wesley would or will suffer actual losses inherently depends upon the number of patients seen by each doctor. The same projections cited by plaintiffs show that if the physicians had a not unreasonable 6600 patient encounters per year, Wesley would break even. (Plf. Exh 27.)

Further, even assuming Wesley anticipated and incurred losses from initiating its own primary care physician program, this does not establish in itself the salaries paid were excessive. The evidence establishes that losses are frequently a necessary component of any new business.

Thus, there is some evidence that the Wesley family practice clinics had losses of $4.1 million for their first 18 months of operation. The plaintiffs allege that Wesley prepared financial forms "projecting $3 million in losses each year." The extent of these losses, however, is exaggerated. Plaintiffs' Exhibit 29 indicates projections for six years; after-tax losses peak in Year 3 at $2.1 million (during which year there is a $1.6 million charge for amortization of the liquidated damages), and thereafter decline to $803,108 in Year 6.

Plaintiffs contend that the primary care physicians' salaries paid by Wesley "substantially" exceed what nonhospitals in the market could economically afford. The uncontroverted evidence does not support this contention. The record before the court indicates that Via Christi has established the competitive market salary in Wichita, paying primary care physicians a base salary of $150,000 plus incentives. Wesley pays a competitive market rate

base of $160,000. Wichita Clinic itself pays several primary care physicians in excess of this amount.

Further, the record provides one example of one physician who currently is employed by Wichita Clinic, but who receives a higher salary there ($262,933) than he would have under Wesley's formula ($228,112).

It is uncontroverted that the hiring could be seen alternatively as a reflection of the defendants' desire to achieve the goal of implementing an integrated health care system, and as a defensive measure— to stop Via Christi from hiring the physicians to increase its already larger share of the market. The evidence indicates that Wesley would have lost more money if the physicians had been hired by Via Christi rather than Wesley.

In connection with their antitrust claim, plaintiffs' economic expert, Dr. Joyce, identified the following relevant antitrust markets: (1) the acute inpatient hospital services market for Sedgwick County; (2) the primary care physician market for Sedgwick County; and (3) the outpatient surgical services market for a six-county area. These markets are linked through admission practices and referral patterns of the primary care physicians in Sedgwick County.

According to Dr. Joyce, Wesley, Via Christi, and Riverside Hospitals are the major participants in the acute inpatient hospital market, and at least 1724 staffed hospital beds in the market. In 1994, Wesley had 460 staffed hospital beds, or 26.7% of the total in Sedgwick County. St. Francis had 681 beds (39.5%), and St. Joseph had 480 beds (27.8%). The two hospitals together would have represented 67.3% of the market, measured by the number of staffed hospital beds. Calculations by Dr. Butler, the defendants' expert,

yield similar results, indicated that in 1995, Via Christi had 62.6% of the total number of staffed beds, while Wesley had 30.2%.

Via Christi also dominates the market measured in terms of the number of hospital discharges. Out of a total of 71,361 discharges in the relevant six-county area in 1995, Via Christi had 36,748 (69.4%) discharges, while Wesley had 21,829 (30.5%). In 1996, Via Christi remained approximately twice as large as Wesley in the number of beds (1028 to 499), according to Dr. Butler, and was also larger than Wesley in terms of total admissions (219,822 to 121,298) and inpatient days (37,814 to 22,377).

Plaintiffs contend that Wesley has "high profit levels," specifically, an average profit margin of 30%. (Plf.Exh. 58, Dougan dep. at 262). Dougan's calculations appear to be earnings before interest, taxes and depreciation margin. (Id., at 262, 343–44). In 1995, Wesley had a total profit margin of 10.4%. (Plf.Exh.144).

Primary care physicians include family practice physicians, pediatricians, and general internal medicine physicians. Plaintiffs' expert, Dr. Joyce, identified four large primary care physician practices, including Wichita Clinic, Wesley, Via Christi, and Riverside. There are also at least 13 smaller practices in Sedgwick County. According to Dr. Joyce, there were 261 primary care physicians in Sedgwick County in 1997; according to Dr. Butler, there were 358.[15] Riverside Hospital had about 5% of the market. In 1997, Via Christi employed between 65 (Dr. Joyce) and 76 (Dr. Butler) primary care physicians; Wesley employed between 25 (Dr. Joyce) and 40 (Dr. Butler); and Wichita Clinic employed between 40 (Dr. Joyce) and 52 (Dr. Butler).

---

**15.** The two experts reach markedly different conclusions as to what should be a fairly straightforward matter—counting doctors. In many instances, the difference appears to be the product of the inclusion of medical student residents, new hires by the Clinic, or the departure of an independent group from Via Christi in 1997. In resolving the summary judgment motion, the court has taken into account the market figures most favorable to the plaintiffs.

Thus, in 1997, Wesley, Wichita Clinic, and Via Christi had the following shares of the Sedgwick County, Kansas primary care physician market, under the calculations of the two experts.

|  | Dr. Butler | Dr. Joyce |
| --- | --- | --- |
| Wichita Clinic | 14.5 | 15.3 |
| Wesley | 7.0 | 15.3 |
| Via Christi | 21.2 | 24.9 |

Dr. Joyce identified 21 entities, including Wesley, Wichita Clinic, and Via Christi involved in the outpatient surgical support services market. The Plastic Surgery Center and Aesthetic Plastic Surgery Center have a combined market share of 2.3%. Dr. Joyce's report also does not include five centers performing outpatient eye surgery.

In 1996, there were 57,680 patients treated in the six-county outpatient services market. Of these, Via Christi treated 45.1%, Wesley treated 19.0%, and Wichita Clinic treated 7.7%.

In his analysis of the probability that the defendants will achieve monopoly power, Dr. Joyce employed the methodology of Antitrust Department's *Horizontal Merger Guidelines.* The Herfindahl–Hirschman Index (HHI) measures market concentration levels, and is calculated as the sum of the squared market share percentages for each market participant. Thus, if two firms had market shares of 60% and 40%, the HHI would be 3600 plus 1600, or 5200. Dr. Joyce defines "market power" as equivalent to "monopoly power," and defines it as "the ability to raise prices or exclude competition." (Def.¶ 64). He defines "monopolization" as "the acquisition or enhancement of market power—the ability to raise price or exclude competition." (Def.¶ 65).

Before Wesley's entry into the primary care physician market, Wichita Clinic had about 18 to 21% of the market. This market share decreased after Wesley's entry. However, the HHI in the primary care physician market declined from 1258 to 1250.

Dr. Joyce calculated that, after Wesley entered the primary care physician mar-ket, the HHI for the market was 124, which he felt was "in the low concentration range." (Def.¶ 66). Dr. Joyce stated that, based on current discharges, Via Christi was "just about two times the size" of Wesley. (Def.¶ 69).

According to Dr. Joyce *both* Via Christi and Wesley have monopolies in the primary care physician doctor. (Joyce Dep. at 341–42).

In his deposition, Dr. Joyce was asked about Wesley's market power, and whether it had the ability to control prices. He responded that it has some influence on prices:

Q. Does it have that ability unilaterally?

A. No. I think that Via Christi also has market power under that scenario.

(Dep. at 187).

Dr. Joyce proposed several intermediate scenarios, which assumed either (1) that Wichita Clinic would fail and that Via Christi and Wesley would hire 22 and 18 physicians, respectively, from the Clinic, or (2) that Wesley would hire 70 physicians in accordance with its 1996 business plan. These two scenarios would yield HHIs of 1758 and 2266, respectively. The second scenario would result in a highly concentrated market.

Dr. Joyce also reports two scenarios for the "end of the movie," in which either (1) Wesley and Via Christi each have 50% of the market share in the primary care physician and outpatient surgical services markets (with a resulting HHI of 5000), or, (2) a more likely scenario in which the hospitals' shares in these markets would "mirror" their shares of the inpatient hospital services market (with an HHI of 2560). Dr. Joyce believes that primary care physicians employed by Via Christi and Wesley will eventually make referrals only to their respective hospitals, which will cause independent outpatient surgery centers, such as the Wichita Clinic, to fail.

Depending on which (if any) of the four scenarios put forward by Dr. Joyce were

to borne out by the course of events, Wesley might acquire 22.2%, 34.6%, 50.0%, or 33.3% of the primary care physician market, respectively. The same scenarios would yield a market share to Via Christi of 33.3%, 26.4%, 50.0%, or 66.7%. According to Dr. Joyce, speaking of the "end of the movie," the fourth scenario was more likely than the third. Dr. Joyce also proposed several scenarios for the outpatient surgery market, which would ultimately yield either 50.0%, 33.3%, or 27.1% to Wesley and either 50.0%, 66.7%, or 45.8% to Via Christi (all, again, respectively).

There is excess capacity in the primary care physician and inpatient hospital services markets. There are more primary care physicians in Sedgwick County than are needed to serve the population. Inpatient volumes are falling in Sedgwick County. Tom Kelly stated that the Via Christi merger was positive because of the overcapacity among hospitals in the Wichita market. According to Kelly, there is also excess capacity in the outpatient surgical services support market; Wichita has too many specialists.

Dr. Joyce also reports that hospitals such as Riverside and Via Christi have operating facilities used for inpatient surgery which "could easily be substituted into outpatient care." (Exh. 11, Joyce Dep. at 190–91).

Dr. Joyce agreed that Wesley suffered "no losses" overall from the hiring of the Wichita Clinic doctors. (Def.Exh. 32, Joyce Rept. at ¶ 59). There were losses within the primary care physician practice.

It is uncontroverted that the former Clinic physicians have been utilized to see and treat patients, have had significant numbers of patient encounters and have not sat idle.

It is uncontroverted that Wesley was motivated by a desire to compete more effectively with Via Christi. According to Dr. Joyce, "an important factor motivating this physician employment policy at Wesley was the continuing employment of primary care physicians by its rival, Via Christi. Wesley was concerned that it would lose referrals if Via Christi were to employ Wesley's affiliated physicians." (Def.Exh. 21, Joyce Rept, at ¶ 35). Joyce's report also states that significant efficiencies derive from physician integration—including associations between physicians and hospitals. These efficiencies include reduced transactions costs, economies of scale, improved management, more efficient protocols, and consolidation of administrative funding. In order to compete for and obtain risk-based managed care contracts, Wesley needed to integrate with physicians, since risk-based contracts are "virtually unavailable to free-standing hospitals without physician groups." (Def.Exh. 13, Kelly dep. at 269). Employers, insurers, and other third party payors value "one-stop shopping" for provider services. Physician integration with hospitals can create such one-stop shopping.

The demand for primary care physicians increased in Sedgwick County after Wesley entered the market.

The experts disagree as to whether Wesley's entry in the market has increased or decreased competition and consumer choice. Dr. Butler states that Wesley's entry has increased competition for primary care physicians and consumer choice. Plaintiffs emphasize that the doctors joining Wesley are prohibited from seeing patients under the Cigna and PKK plans. The plaintiffs' supporting evidence is inadequate. The evidence indicates that PKK declined to contract with Wesley rather than the other way around. Wesley did decline to contract with Cigna, since that company's hospital provider contract was with its competitor, Via Christi.

Plaintiffs assert, based on Dr. Joyce's conclusions, that Columbia/HCA's conduct "portends to increased prices" and create other monopolistic results (see Plf.Resp. at 11, ¶ 71), but these (Dr. Joyce's) conclusory opinions are not shown to be grounded in any specific facts. There is no evidence that, subsequent to the creation of Wesley's family practice clinics, it has actually caused overutilization of hospital facilities,

significant redirection of hospital referrals, diminished competition, increased costs or otherwise damaged consumer interests. No direct evidence supports an inference that Wesley's charges are significantly or unfairly in excess of its marginal costs, or that consumer choice has been diminished by actions attributable to the defendants.

The opening of the West Wichita Family Physicians, a primary care physician practice composed of 13 former Via Christi employees who left that hospital in 1997 demonstrates the presence of competitive forces in the market. The entry of Wesley into the primary care physician market increased rather than diminished the level of competition as the evidence from the experts establishes. Using either the figures of Dr. Joyce or Dr. Butler, the HHI level in the primary care physician market decreased after Wesley's entry into the market from 1257.9 to 1250.1 or from 884.1 to 799, respectively. (Def.Exh. 29, at 3A, 3B).

After the merger which formed Via Christi, Wesley has twice instituted 10% price increases. According to evidence submitted by Wesley, however, these price increases apply to only around 13% of its patients.

Plaintiffs contend that Columbia/HCA is able to devote greater resources to development of physician-related services than they can. It cites the general assets ($4.4 billion) and pre-tax income ($2.7 billion) of Columbia/HCA, but the suggestion that all of these resources, or even the great majority of them, are resources which will or may be invested in physician service practices in the relevant Wichita, Kansas area markets has no evidentiary support.

The number of patients seen by family practice physicians at Wichita Clinic's facilities in Sedgwick County has dropped by at least 25% over the previous year. In 1997, the Wichita Clinic had operating losses of $2.6 million, and liabilities of $9.2 million. Total stockholder equity was $5.9 million. IHS had net operating income of $1.0 million, total liabilities of $17 million, and stockholder equity of $2.7 million.

Plaintiffs' damages expert, David Allen, has calculated plaintiffs have lost $135 million in profits and diminution of value because of the alleged breach of the Letter of Agreement. Allen has calculated that plaintiffs' lost profits total $17 million from 1995 to December 31, 1997. According to Allen, the plaintiffs' unjust enrichment damages are between $84.8 and $123.1 million. Of these unjust enrichment damages, Allen stated that $12.8 million were based upon profits earned by Wesley in increased hospital referrals, and $72 million to $110.3 million were based upon the profits earned by Wesley in renewing its hospital provider contract with Blue Cross. Allen calculates that plaintiffs have suffered $122 million in diminution of value. Had the 1994 "Strategic Plan" of Wichita Clinic been fully implemented, Allen believes Wichita Clinic and IHS would be worth $101 million. As of January 1, 1998, he believes they are in fact worth $28 million. His diminution of value damages reflect a methodology that discounts cash flow based on predicted future earnings of plaintiffs over the next five years.

As noted earlier, there are a host of facts which have been asserted by the plaintiffs which have not received evidentiary support consistent with the requirements of Fed.R.Civ.Pr. 56 or D. Kan.Rule 56.1. Such allegations include, for example, the claim that the defendants, throughout the relevant time period, were employing a secret strategy of seeking to acquire a primary care physician base. However, the evidence asserted in support of this allegation (¶ 26) only relates to actions by Wesley after the joint venture discussions fell apart.

Plaintiffs also cite evidence as supporting a claim that Wesley intended to hire 70 to 100 primary care physicians. But, again, none of the evidence demonstrates such an intent *prior to the termination of the joint venture discussions.* Moreover, the evidence in fact indicates that Wesley believed 70 to 100 primary care physicians would be necessary to provide coverage as

a part of its intended network of integrated coverage, not that this many physicians would be directly hired by Wesley. (Plf.Exh. 78, Underwood dep. at 53). The same witness directly testified that Wesley was not "necessarily interested in hiring, you know, dozens and dozens of primary care doctors." (Id., at 52).

Plaintiffs also fail to support their claim that "[w]ithin six months" of its recruiting plan, Wesley had hired 40 primary care physicians. The facts do establish that after the creation of its physician recruiting plan in the fall of 1995, Wesley had hired 28 primary care physicians, reflecting between 7 and 15% of the primary care physician market. As indicated earlier, 13 of these physicians were formerly employed by Wichita Clinic.

The plaintiffs do not support adequately their allegedly uncontroverted fact that defendants paid the former Wichita Clinic physicians "on average 10% a year more in salary." (Plf.Resp. at 9, para 54). The evidence provided in support of this claim is a comparison of the physicians' 1995 and 1997 salaries (Plf.Exh.43), but there is no evidentiary basis for the 1995 salaries, and the 1997 salaries are derived from W–2s which include non-salary bonuses to compensate for lost Wichita Clinic pension benefits and the tax consequences of the payment of the liquidated damages. By way of further example, evidence provided by plaintiffs does not support their claims that defendants did not hire any Via Christi physicians (Plf.Resp. at 7, ¶ 41), that Wesley controls primary care physician referrals, or that it has used such control to increase its market share, or that Wesley particularly "targeted" Wichita Clinic primary care physicians. (Plf.Resp. at 128, ¶ 36). Rather, as discussed elsewhere, the evidence establishes that it sought to directly hire primary care physicians. Wesley gave notice to the approximately 300 physicians throughout the area who had admitting privileges with Wesley.

Wichita Clinic and IHS also allege that Columbia/HCA by hiring Wichita Clinic's physicians "intended to harm the Wichita Clinic." (Plf.Resp. at 7, ¶ 38). As support, plaintiffs cite evidence that Jim Kelly told Knack of Blue Cross that "he felt the Wichita Clinic was vulnerable." (Plf.Exh. 69, Knack dep. at 42). But the context of this "vulnerability" is never provided, nor is there evidence that Kelly was indicating an intent to capitalize—fairly or unfairly—on this "vulnerability." Plaintiffs have not demonstrated that Wesley, by hiring primary care physicians, *intended to injure Wichita Clinic as opposed to obtaining an economic benefit to itself.*

Finally, the plaintiffs consistently invoke a "Merger and Acquisition Strategy" on the part of the defendants. In this context, plaintiffs place great weight on the document, marked "confidential," which it has introduced as their Exhibit 159, (Document D006400–6407), and which they contend reveals a "merger and acquisition strategy" with the goal of "dominating" the Wichita market. They contend it demonstrates the defendants sought to acquire profitability through "physician integration"—acquiring primary care physicians to increase referrals to Wesley's very profitable inpatient and outpatient facilities.

The six-page document does state a "General Aim" is to "[d]evelop a statewide network of medical facilities and providers to dominate the market." (Plf.Exh. 159, at 1). But the document does not outline the sort of predatory strategy which plaintiffs' gloss suggests, and does not indicate defendants sought, prior to the end of the joint venture negotiations, to directly employ physicians. To the contrary, the document outlines separate "strategies" for the separate areas of "COMPREHENSIVE HEALTH SERVICES," "PHYSICIANS," and "INFRASTRUCTURE/LINKAGES." (Id., at 1). As to physicians, the plan's general outline simply provides: "Partnership, joint venture or syndicate with physicians in Kansas." (Id.)

In its specific discussion of physicians, the plan repeats the general goal of creating "Partnership, joint venture or syndicate with physicians in Kansas." (Id., at 5) It does outline an approach which would "[i]dentify, contact and persuade" physicians to "come to Wesley," and "encourage disenfranchised physicians to realign with Wesley." (Id.) Critically, however, both of these approaches are explicitly labeled "Proposed" strategies—there is no evidence they were ever actually adopted in fact—and, more importantly, they both deal only with physicians working for St. Francis or St. Joseph. Wichita Clinic is mentioned in the document, but only with the recommendation, also characterized as "Proposed," that it (along with IMA and the Galichia group) be "evaluate[d]" as either a "partner[ ]" or an "acquisition." (Id.)

Thus, at least as far as the defendants' intentions toward Wichita Clinic, the document shows precisely nothing. Far from being evidence of an actual acquisition strategy adopted by defendants, it is a *proposal for Wesley to consider* doing precisely what it eventually did—exploring with Wichita Clinic the possibility of a joint venture.[16]

In 1998, Wesley remains half the size of Via Christi as to inpatient and outpatient services.

The plaintiffs contend that Wesley stopped hiring physicians when the present litigation began, but that Wesley originally sought to hire 100 primary care physicians and that it "plans to continue its effort to employ primary care physicians." (Plf.Resp. at 16, ¶ 101). The cited evidence says nothing about a discontinuation of hiring because of litigation, and in fact speaks only of an "initial target" of 40–50 physicians, that "there weren't any upper targets," and that "we stopped at 30 when we got there and decided we were going to take a breath and not do any more [because] the supply of physicians who wanted to be employed or acquired has stabilized. There's not a lot of additional opportunity out there for physicians who are interested in this strategy." (Plf.Exh. 62, Gross dep. at 119).

It is uncontroverted that the acquisition of primary care physicians by Via Christi and Wesley has significantly reduced the number of physicians who can be retained by individual contract. Entry into either the physician services or outpatient services markets is more difficult because a potential entrant must enter all the integrated markets to provide the full range of services offered by the incumbents.

It is uncontroverted that Wesley introduced no new primary care physicians into the market who were not already actively seeing patients and admitting patients to Wesley's hospital and outpatient facilities.

The plaintiffs contend that the defendants' profit margins are an accurate measure of market power, and plaintiffs' expert states that "high prices" can be one indicator of monopolistic power. However, plaintiffs never demonstrate that Wesley's

---

16. In this context, the plaintiffs also cite a July 19, 1993 memo by Wesley President and CEO Blitz to Wick Lyne, President of HCA's Western Group Operations, which states:

> I recommend that we proceed with the exercising of the option [to buy the Clinic's building] with the condition or understanding that during the next 2–4 years we shall pursue to vertically integrate COLUMBIA/HCA Wesley Medical Center and the Wichita Clinic. This vertical integration would ultimately mean the purchase of the Wichita Clinic practice and its remaining assets.

(Plf.Exh.133). This proposal—and there is no evidence the option to purchase the Wichita Clinic building was ever anything more than a proposal—was advanced a year before the joint venture negotiations began, by an officer of Wesley who played no role in those negotiations. Indeed, the memo is from an officer of Wesley prior to the time it was purchased by Columbia, and has little relationship to what the principals may have intended nearly two years later. The fact remains that the plaintiffs have failed to demonstrate the joint venture negotiations were not conducted in good faith, or that any representations made by the defendants during that period were false at the time they were made.

profits are significantly high. That profit margin alone is not an indicator of a danger of monopolization is demonstrated by the fact that Riverside Hospital, with 4% of the hospital market, has higher profit margins than its much larger rivals.

## Conclusions of Law

### 1. Anti–Trust Claims

In its order denying the Motion to dismiss, the court ultimately concluded that plaintiffs should have the opportunity to present facts relating to their claims of attempted monopolization of the relevant markets under Section 2 of the Sherman Antitrust Act. The court noted, however, that it was "unclear how Columbia's alleged actions threaten competition (as opposed to the interests of a single competitor) any more than would have the joinder of Columbia and Wichita Clinic, which was the focus of the negotiations between the parties." 1997 WL 225966 at *6. The court specifically recognized that "[i]t may well be that, if anything, Columbia's entry into the primary care physician services market has increased competition." Id. The uncontroverted facts establish this as more than a mere possibility. Rather, it accurately portrays the circumstances in the relevant markets.

The facts have failed to support any threat to competition in the relevant markets. The plaintiffs' antitrust claims accordingly will be dismissed because the plaintiffs have failed to prove any antitrust injury, have failed to show a dangerous probability of success of monopolization, and have failed to demonstrate illegal predatory conduct on the part of the defendants.

In their response brief, the plaintiffs claim a series of damages which they allege were caused by the actions of the defendants. But, to have standing to bring an antitrust claim, the plaintiffs must do something more than allege injury-in-fact. They must show an antitrust injury,

an "injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful," *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). *See Reazin v. Blue Cross,* 899 F.2d 951, 962 n. 15 (10th Cir.), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990) (quoting Brunswick). In the present case, the plaintiffs' allegations of injuries simply represent "losses stemming from continued competition" and are not remediable under Section 2. *Atlantic Richfield Co. v. USA Petroleum,* 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (internal quotations omitted).

■ The plaintiffs contend that the defendants' actions have undertaken an illegal scheme to violate federal Medicare fraud rules, thereby resulting in various injuries to plaintiffs. 42 U.S.C. § 1395nn prohibits health care providers from receiving kickback compensation for Medicare referrals.[17] Even assuming such a violation was proven, it would not establish that plaintiffs have suffered an antitrust injury. The court has found no case concluding that similar allegations of health care fraud violations constitute the sort of antitrust injury that would justify a claim under Section 2 of the Clayton Act. To the contrary, there are a number of cases rejecting such an approach. Thus, in *Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.,* 5 F.Supp.2d 694, 702 (D.Minn.1998), the court observed:

> Plaintiffs contend that the removal of CRNAs as hospital employees results in public antitrust injury because CRNAs are no longer available to thwart the alleged "double-billing" and Medicare fraud. Such an injury, however, is not the type the antitrust laws were designed to prevent.

---

17. The defendants deny any violation of the anti-kickback statute. To the extent there is evidence suggesting Wesley or Columbia/HCA expected additional referrals from directly employing physicians, the defendants stress the evidence does not suggest these expectations either included or targeted Medicaid or Medicare patient referrals.

*See also Action Ambulance v. Atlanticare Health Serv.,* 815 F.Supp. 33, 38 (D.Mass. 1993).

■ "It is axiomatic that the antitrust laws were passed for 'the protection of *competition,* not *competitors.*'" *Brooke Group v. Brown & Williamson Tobacco,* 509 U.S. 209, 224, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) *(quoting Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)) (emphasis in *Brown Shoe* ). Here, the plaintiffs' allegations of antitrust injury are all directed at the alleged damage to their own position in the physician services market. To the extent the plaintiffs have alleged injuries to competition, such as a reduction in consumer choice, the claims are wholly unproven. There is no evidence of any patient being denied access to the health care provider of her choice.

Neither have the plaintiffs provided any evidence that, even assuming the defendants have incurred significant losses by entering the physician services market through the hiring of former Wichita Clinic physicians, the defendants will be able to recoup these losses by achieving monopoly power in the relevant markets.

> Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or "purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Hunt v. Crumboch,* 325 U.S. 821, 826, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945).

*Brooke Group,* 509 U.S. at 225, 113 S.Ct. 2578.

■ The plaintiffs here have also failed to demonstrate a dangerous probability of success in monopolizing the relevant markets. Predatory practices are illegal only if they impair opportunities of rivals, are not competition on the merits or go beyond reasonable competition, and appear reasonably capable of contributing significantly to creating or maintaining monopoly power. *See Multistate Legal Studies v. Harcourt Brace Jovanovich Legal & Prof'l Public'ns,* 63 F.3d 1540, 1550 (10th Cir. 1995), *cert. denied,* 516 U.S. 1044, 116 S.Ct. 702, 133 L.Ed.2d 659 (1996). In *Multistate Legal Studies,* the Tenth Circuit discussed the standards relevant to this requirement:

> "To establish the dangerous probability of success element of an attempted monopolization claim, 'the plaintiff must show that there was a dangerous probability the defendant would achieve monopoly status as the result of the predatory conduct alleged by the plaintiff.'" *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 894 (10th Cir.1991) *(quoting Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America,* 885 F.2d 683, 693 (10th Cir.1989), *cert. denied,* 498 U.S. 972, 111 S.Ct. 441, 112 L.Ed.2d 424 (1990)). Factors relevant to determining dangerous probability include, but are not limited to, a defendant's market share, whether the defendant is a multimarket firm, the number and strength of other competitors, market trends, and entry barriers. *See id.; Shoppin' Bag of Pueblo, Inc. v. Dillon Cos.,* 783 F.2d 159, 162 (10th Cir.1986). Where predatory pricing is alleged, the defendants' financial strength and ability to absorb losses are also relevant. *See Brooke Group,* 509 U.S. at 225, 113 S.Ct. at 2589; *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 119 n. 15, 107 S.Ct. 484, 494 n. 15, 93 L.Ed.2d 427 (1986). Because we are talking about probabilities, it is not necessary for a defendant to already possess monopoly power in the target market; indeed, if it did, the offense would be monopolization, not attempt. Of course, "[t]he higher the firm's initial market share, the greater the likelihood that it will eventually gain monopolistic control over the market." *Colorado Interstate Gas,* 885 F.2d at 694.

The evidence relating to the relevant market conditions is discussed above. Af-

ter hiring the thirteen physicians in 1996, the plaintiffs have failed to show any continuing increase in the defendants' presence in the physicians services market. The ultimate result of all the facts presented herein is that, even in the worst-case scenarios—with Wichita Clinic literally collapsing—created by plaintiffs' expert, the defendants still will not acquire monopoly power in the relevant markets.[18] By every standard, Wesley remains smaller than Via Christi.

It is true that the defendants are large in size, and that there are some barriers to entry into the relevant markets. The court recognized as much in its order denying the motion to dismiss. 1997 WL 225966, at *6. The plaintiffs have failed, however, to demonstrate that these circumstances will be used, or that there is a dangerous probability they will be used, to create a monopoly in the relevant markets. While the defendants possess significant resources, so does Via Christi. In none of the scenarios presented by the plaintiffs do they present any credible evidence that Via Christi will be driven from the market—or indeed that it would even lose its status as the dominant participant in the relevant markets.

In its earlier ruling, the court noted that there was no minimum " 'market share percentage required before a finding of monopoly power can ever be sustained.' " *Wichita Clinic v. Columbia/HCA Healthcare Corp.*, No. 96–1336–JTM, 1997 WL at 225966 at *4 (D.Kan. April 8, 1997),(quoting *Reazin,* 899 F.2d at 967–68.) Nonetheless, the plaintiffs have not cited, and the court has not found, any case finding a dangerous probability of monopolization where the alleged monopolist will not only fail to acquire a majority of the relevant market, but will also remain smaller in size than one of its competitors.

To demonstrate a dangerous probability of success, the plaintiffs must show both that the defendants will have the ability to control prices and an ability to exclude competition. *Shoppin' Bag of Pueblo, Inc. v. Dillon Co's,* 783 F.2d 159, 164 (10th Cir.1986).[19] Here, the plaintiffs have at most shown that the defendants will have some ability to influence prices in the relevant markets. In a competitive environment, almost every participant will have some ability to influence prices. But Section 2 applies only where the defendant possesses the ability to control prices. *See Eastman Kodak v. Image Technical Serv.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (recognizing that Section 2 requires proof of monopoly power). The plaintiffs have failed to demonstrate that Via Christi could not or would not counter any potential price increases by the defendants.

The plaintiffs suggest that a potential danger of monopolization is demonstrated by the affidavit submitted by Dr. Butler in another action,[20] in which he expressed an opinion that there was a potential danger of monopolization where the defendant

**18.** Defendants contend that plaintiffs' expert, Dr. Joyce, erroneously applied Horizontal Merger Guidelines, relevant to a Section 7 claim under the Clayton Act. There is authority for the principle that Section 7 actions (which involve proposed mergers) involve a different, higher standard of legality than actions under Section 2. *Brown Shoe,* 370 U.S. at 318, 82 S.Ct. 1502.

**19.** The plaintiffs suggest *Shoppin' Bag* indicated that either price control or an ability to exclude competitors satisfies the dangerous probability of success element. This misreads the case. While the court recognized this was the argument of the appellant, 783 F.2d at 163, it then reviewed language from *United States v. E.I. du Pont de Nemours,* 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) and *United States v. Grinnell,* 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) before concluding:

> In light of the *du Pont* holding, we believe that both elements have been necessary since the test's initial inception....
>
> We hold, therefore, that monopoly power is correctly defined in this circuit as the ability to control prices *and* exclude competition.

783 F.2d at 164 (emphasis in *Shoppin' Bag* ).

**20.** *United States Surgical Corp. v. Orris, Inc.,* Case No. 96–2300–GTV (D.Kan.)

possessed 45.2% of the relevant market. (Plf.Exh. 138, at 15, ¶ 28).

This is insufficient to demonstrate a material issue of fact in the present case. Read in full and in context, Dr. Butler's analysis in *U.S. Surgical* does not support a denial of summary judgment. After generally identifying the market positions of the defendant in the general "market for disposable laparoscopic surgical devices," Dr. Butler then proceeded to analyze ten submarkets. (Id.) Where the defendant held a smaller share—32 % in one of the submarkets—Dr. Butler wrote that "[t]he low market share precludes the possibility of significant market power." (Id. at 18, ¶ 33). Here, the defendants possess a significantly smaller proportion of the primary care physician services market. Moreover, the uncontroverted facts again establish that, even in the worst case scenario imagined by plaintiffs, the defendants will not acquire more than half of the relevant markets, and will always remain significantly smaller than their main competitor. The plaintiffs have failed to show a dangerous probability of monopolization.

Summary judgment is also appropriate on the grounds that the plaintiffs have failed to show anticompetitive conduct. In response to the motion to dismiss, the plaintiffs argued that anticompetitive conduct was demonstrated by the defendants' wrongful use of trade secrets, and by paying the former Clinic physicians "excessive" salaries. In their response to the motion for partial summary judgment, the plaintiffs make no attempt to argue that trade secret violations exist which would support a finding of predatory conduct. They do argue that anticompetitive conduct exists in (1) wrongfully securing referrals to its facilities, (2) tortiously interfering with its employment agreements with the physicians, (3) breaching the confidentiality agreement, and (4) predatory hiring.

The court finds that these claims do not present substantial legal grounds for finding predatory conduct by the defendants. As noted earlier, even assuming the defendants illegally sought to obtain Medicare referrals to their hospital facilities, this does not reflect the type of activity which the antitrust laws were designed to prevent. Plaintiffs present no authority whatsoever to support such a finding. (Resp. at 49–53) And, discussed below, the court finds that there are clear grounds for summary judgment on the claim of breach of the confidentiality agreement. As to the claim of tortious interference, the court finds the claim is subject to summary judgment to the extent plaintiffs seek damages beyond the liquidated damages provisions contained in the employment agreements.

■ The plaintiffs have failed to show anticompetitive, predatory conduct in the hiring of the thirteen physicians from Wichita Clinic. As the court noted in its earlier order, the plaintiffs contend a predatory approach is demonstrated by "excessive" salaries paid to the physicians. 1997 WL at *6. In the leading case of *Universal Analytics v. MacNeal–Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir.1990) (per curiam), the court wrote:

> Unlawful predatory hiring occurs when talent is acquired not for purposes of using that talent but for purposes of denying it to a competitor. Such cases can be proved by showing the hiring was made with such predatory intent, i.e. to harm the competition without helping the monopolist, or by showing a clear nonuse in fact. Absent either of those circumstances, according to Professors Areeda and Turner, employment should not be held exclusionary.

The plaintiffs respond by citing to a footnote contained in *Universal Analytics*, in which the court wrote the plaintiff "might also have succeeded had it been able to demonstrate that MSC intended to pay the UAI programmers more than MSC could reasonably expect as a return from their work." Id. at 1258 n. 3.

Little weight can be placed on this footnote. First, there is no authority provided

for the statement, which is clearly dicta. Instead, the court affirmed the dismissal of the predatory hiring claim, even though the plaintiff had obtained a memo of the defendant, marked "Do not put this in personnel folder—throw out," which recommended hiring one of the plaintiff's employees as "a winner [and a]lso we wound UAI again." Id. at 1259. The court wrote:

> "The memo at most shows that a secondary motivation of the hiring was to disadvantage the competition. The memo does not undermine MSC's legitimate business reasons for hiring much needed and competent computer programmers, or permit a jury to find that any of MSC's reasons for hiring the programmers was pretextual."

Id.

Second, the Ninth Circuit has itself retreated from the suggestion in the *Universal Analytics* footnote that predatory hiring can be shown by a high salary, as well as by the more standard proof of either nonuse of the employee or direct evidence of predatory motive. In *American Prof'l Testing v. Harcourt Brace Jovanovich Legal & Prof'l Public'ns,* 108 F.3d 1147 (9th Cir.1997), the court concluded that the plaintiff's predatory hiring claim "failed to meet the two-prong test set forth in *Universal Analytics* (harm American without helping Harcourt or Harcourt did not use Jarvis' services)." 108 F.3d at 1153. The court made no mention of any alternative, third possibility, that such a claim could be sustained based on the level of pay given the hiree. *See also: Independent Entertainment Group v. National Basketball Ass'n,* 853 F.Supp. 333, 339 (C.D.Cal.1994) ("a monopolist cannot be sued for 'predatory' hiring of employees unless they are hired solely to keep them from a rival").

Finally, and most importantly, all cases discussing the predatory hiring of employees, including *Universal Analytics,* are closely tied to the discussion by Professors Areeda and Turner, who write that

> Acquiring talent not to use it but to deny it to possible rivals is exclusionary. Such an arrangement has the same harmful tendency and the same lack of redeeming virtue as the promise by a non-employee that he will not compete with the monopolist. But unlike the latter agreement whose existence or nonexistence is a rather clear-cut question, exclusionary employment would be hard to identify. A monopolist would probably use important talent once acquired. And the court should not try to judge whether the acquired talent was used more effectively than readily available alternative personnel. Nor should it try to do so when the defendant pursues a hard-to-match, if not unmatchable, program of recruiting, say, young researchers in his field. *In the absence, therefore, of the monopolist's proved subjective intent to hire talent preclusively or of clear non-use in fact, employment should not be held exclusionary.*

*Antitrust Law,* ¶ 702b at 110.

This authority clearly indicates that claims of predatory hiring should be restricted to cases in which the plaintiff can demonstrate either nonuse of the employee or a proven intent to hire for the *sole purpose of denying the employee to the plaintiff.* Here, there is no proof that Wesley hired the thirteen physicians only to keep them from being used by the Clinic. There is no proof that Wesley did not actively employ the physicians. To the contrary, the uncontroverted evidence establishes that Wesley continues to actively use the physicians and has obtained benefits from their services.

Nor is there any basis for concluding that the salaries paid to the physicians are so "excessive" that they reflect predatory conduct under the antitrust laws. First, as noted above, in the context of the overall economic picture, the hiring of the physicians did not produce any losses. There is no evidence Wesley will not recover its marginal costs in employing the physicians. *See Multistate Legal Studies,* 63 F.3d at 1548–49.

Again, as discussed elsewhere, it is irrelevant for present purposes whether the defendants' conduct in seeking increased referrals might also constitute a violation of Medicare provisions. The important point here is that the higher salaries are not invalid from an economic standpoint. They do not support the plaintiffs' assertion that the true motive was to harm Wichita Clinic.

Second, even assuming Wesley was to incur some losses from the higher salaries, this in itself would not tend to demonstrate anticompetitive conduct where, as here, it is uncontroverted that the defendants were attempting to enter a new market. Given the policies which seek to encourage workers· to choose where they wish to work, Order, 1997 WL 225966 at *9, and encourage firms to enter new markets, 3 Areeda & Elhauge, *Antitrust Law*, ¶ 747c (1996), the salaries paid to the former Wichita Clinic physicians cannot be seen as evidence of anticompetitive behavior.

The defendants argue that the antitrust claims should also be dismissed because the plaintiffs have failed to provide evidence of a specific intent to monopolize. The plaintiffs' response argues that the specific intent to monopolize can be inferred from engaging in anticompetitive conduct. *Reazin*, 635 F.Supp. at 1332. The defendants concede this is the rule, but argue in their reply that there is no basis for any finding of predatory conduct, and thus no basis for making an inference of wrongful intent. For the reasons stated above, there is an absence of any proof of predatory conduct. But the court does not agree that the the defendants' specific intent argument provides an independent reason for granting summary judgment.

Finally, defendants seek dismissal of IHS's antitrust claims, contending that IHS, which has acted as a mere supplier of Wichita Clinic, does not have the standing to pursue any antitrust claims against the defendants. As a supplier of an (allegedly) injured direct competitor, IHS would not have standing to sue under Section 2. *See Sharp v. United Airlines*, 967 F.2d 404

(10th Cir.) *cert. denied,* 506 U.S. 974, 113 S.Ct. 464, 121 L.Ed.2d 372 (1992). Although the plaintiffs attempt to portray IHS as an integral component of Wichita Clinic, the agreements between the parties establish that IHS effectively acted as an independent contractor, and was explicitly authorized to perform services for "other professional medical groups." (Def.Exh. 4, Management and Operating Agmt. at § 3.1). Summary judgment will be granted as to IHS's antitrust claims.

## 2. Fraud

The court will dismiss plaintiffs' claims of fraud. The plaintiffs contend that, rather than maintaining any actual intent to adhere to the terms of the Letter of Intent, the defendants were motivated solely by a desire to obtain renewal of the Blue Cross provider contract. They contend that the defendants had an ulterior goal of acquisition of physician provider entities; that the defendants fraudulently failed to reveal their valuations of the Clinic were significantly lower than $30 to $36 million, and that after significant negotiations the defendants attempted to gain the adoption of an Addendum which fundamentally altered the nature of· the proposed relationship.

Summary judgment will be granted because the uncontroverted facts, as stated earlier, do not support any claim for fraud. The plaintiffs have not shown any justifiable reliance, have not demonstrated they subjectively relied on any representations of the defendants, and have not provided any proof of fraudulent intent on the part of the defendants.

The first problem for the plaintiffs is justifiable reliance. To present a triable claim of fraud, the plaintiffs must show that they justifiably relied on representations made by the defendants. This cannot be done under the facts presented here. Although the plaintiffs offer various attempted distinctions—none correct on the facts or persuasive in nature—the claim for fraud in the present action is

subject to summary judgment for the reasons discussed by this court in its opinion in *Kanco Distrib. Inc. v. Snapper, Inc.,* Case No. 96–1397–JTM, 1998 WL 47594 (D.Kan. Jan. 26, 1998). In that case, after first dismissing various tort claims advanced by KanCo, the court also dismissed its claims sounding in fraud:

> KanCo's various fraud claims are hereby dismissed for similar reasons. Under the facts of the case, plaintiffs cannot demonstrate justifiable reliance on the alleged "assurances" from Snapper where Snapper also insisted on its right to unilaterally terminate the relationship, and where, as KanCo's president acknowledged to the board after recounting the communications with Snapper, "there were no guarantees" KanCo would remain a Snapper distributor.

The lack of a substantive claim for fraud under these circumstances is reflected in *Flight Concepts Ltd. v. Boeing Co.,* 819 F.Supp. 1535, 1550 (D.Kan. 1993), *aff'd,* 38 F.3d 1152 (10th Cir.1994). In that case, the plaintiffs alleged Boeing had promised to devote substantial funds to a project, which it ultimately terminated. The court granted summary judgment on the plaintiff's fraud claim, in light of a contract clause which specifically gave Boeing the right to terminate the contract.

> It makes no sense for plaintiffs to assert that they relied upon statements about the amount of money that Boeing intended to invest when they have signed an agreement giving Boeing the right to terminate the agreement at any time and eliminating any duty requiring Boeing to sell or produce the Skyfox airplane.

Id.

1998 WL 47594 at *10.

Here, the Letter of Intent expressly provided that it was nonbinding in nature. The agreement gave both parties to the agreement an unqualified right to terminate the joint venture negotiations at any time. Given the explicit, nonbinding nature of the Letter of Intent, the plaintiffs cannot have reasonably relied on any alleged oral representations by the defendants. Under Kansas law, the injured party's reliance must be " 'reasonable, justifiable and detrimental.' " *Slaymaker v. Westgate State Bank,* 241 Kan. 525, 531, 739 P.2d 444 (1987) (*quoting Hutchinson Travel Agency, Inc. v. McGregor,* 10 Kan. App.2d 461, 464, 701 P.2d 977, *rev. denied,* 238 Kan. 877 (1985)).

In addition, summary judgment is warranted because the uncontroverted facts establish that the plaintiffs did not subjectively rely on any alleged misrepresentations by the defendants. The Clinic and IHS were aware that the Letter of Intent was nonbinding. Their representatives in fact knew that the agreement was incomplete and needed significant further negotiations. Although the Letter of Agreement does preclude the parties from attempting to negotiate with third parties to create an integrated delivery system, the agreements did not otherwise prohibit the plaintiffs from obtaining other capital partners. And the facts indicate that, far from relying on the joint venture negotiations, the plaintiffs themselves implemented plans to obtain financing and invest in Premier Blue prior to the end of the joint venture negotiations.

■ Finally, the plaintiffs have failed to submit evidence that the defendants made misrepresentations which, at the time of their making, were made with an intent to deceive. *Young v. Hecht,* 3 Kan.App.2d 510, 515, 597 P.2d 682 (1979). The defendants have submitted evidence from their agents stating that during 1994 and 1995 they were engaged in good faith negotiations with the plaintiffs to work out the terms of the proposed joint venture. The plaintiffs, in contrast, have failed to produce evidence demonstrating or suggesting that the defendants acted with fraudulent intent. In fact, plaintiffs' negotiators have conceded they believed the defendants were negotiating in good faith.

In attempting to provide evidence of fraudulent intent, the plaintiffs cite various documents which they contend represent a "secret plan" to physically acquire the Clinic. These documents do not support the interpretations placed on them by the plaintiffs. For example, the plaintiffs repeatedly invoke Exh. 159 as evidence of a covert "acquisition" strategy by the defendants. In fact, the exhibit merely acknowledges, as a *"[p]roposed"* goal, a program to *"[e]valuate* groups as formal *partners*/acquisition targets." (Exh. 159, emphasis added). The plaintiffs are able to present this document as some sort of smoking gun only by blindly avoiding any mention of the language emphasized.

The plaintiffs were fully aware that, in 1994 and 1995, the defendants wished to obtain some basis for competing more effectively with Via Christi, which had its own physician network. It now professes to be shocked, *shocked* that at some point in time someone employed by defendants even considered the possibility of buying the Clinic (or some other physician group). In reality, it would surely be astonishing if defendants, in exploring how to cope with the competition posed by the new Via Christi entity, failed to consider every possible option. But the plaintiffs have presented nothing beyond this. What they have failed to provide is *any* proof—let alone proof of a clear and convincing nature—that, *during the joint venture negotiations*, the defendants were acting with fraudulent intent.

Nor do the course of negotiations provide any evidence of fraudulent intent. That the defendants sought to renew their contract with Blue Cross does nothing to prove that it was acting with fraudulent intent in the joint venture negotiations. Further, the uncontroverted evidence discussed above establishes that the defendants consistently worked to obtain the valuations suggested by the Clinic; the evidence does not establish anything other than a direct attempt to make the joint venture work. The plaintiffs contend that the Addendum proposed by the defendants constitutes a radical alteration of the nature of the joint venture. But, the uncontroverted evidence establishes that the plaintiffs' own personnel considered the Letter of Intent inconsistent and in need of additional interpretation. After receiving the Addendum, Jim Kelly of the Wesley wrote that the defendants were willing to return to the original Letter of Intent, and expressing his belief that "through our continued dialogue we will achieve our shared vision—a truly integrated delivery system focused on improving the health of the communities we serve." (Uncontr. Fact ¶ 187).

Given the evidence presented by the parties, the court must conclude that the fraud claims advanced by plaintiffs are without merit.

## 3. Unfair Competition

■ The court grants summary judgment on the plaintiffs' claim for unfair competition. The plaintiffs' claim is predicated on the allegation that defendants engaged in unfair competition by wrongfully using trade secret information. There is no allegation that the defendants wrongfully appropriated proprietary matters, such as a trademark belonging to the Clinic. Recent Kansas cases discussing the tort of unfair competition have all involved claims of misuse of intellectual property.[21] The court concludes that Kansas would not apply its tort of unfair competition under the present facts.

In their response, the plaintiffs rely on the decision of the Kansas Supreme Court in *Koch Eng'g Co. v. Faulconer*, 227 Kan. 813, 610 P.2d 1094 (1980). *Koch* cannot support a denial of summary judgment in the present action. That action was for injunctive relief only, and occurred prior to

---

21. *See Manor of Burlingame, Inc. v. SHCC, Inc.*, 22 Kan.App.2d 437, 916 P.2d 733 (1996); *Gragg v. Rhoney*, 20 Kan.App.2d 123, 884 P.2d 443 (1994); *Harp v. Appliance Mart, Inc.*, 16 Kan.App.2d 696, 827 P.2d 1209 (1992); *Wichita Wire v. Lenox*, 11 Kan.App.2d 459, 726 P.2d 287 (1986).

the adoption of the Uniform Trade Secrets Act (K.S.A.60–3320) in Kansas. Thus, the decision provides no support for concluding that a claim for damages due to unfair competition can be predicated on an action other than the illegal use of intellectual property.

### 4. Tortious Interference with Contract

█ The defendants seek dismissal of the plaintiffs' claims for tortious interference with contract on three grounds. Simultaneously, the plaintiffs have moved for summary judgment in their favor, seeking a determination that the defendants did tortiously interfere with their employment contracts with their physicians, which included noncompetition clauses. The plaintiffs argue that the business competitor's privilege identified in the Restatement (Second) of Torts, § 768 [22] cannot apply to the defendants' conduct because of the existence of noncompetition clauses in the physician employment ·agreements. The plaintiffs accordingly contend that summary judgment should therefore be granted in their favor.

The Kansas Supreme Court most recently restated the elements of a claim for tortious interference with a contract in *Hawkinson v. Bennett*, 265 Kan. 564, 599, 962 P.2d 445 (1998), stating:

> In *Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164, 169, 872 P.2d 252 (1994), the court delineated the elements necessary to prove tortious interference with a contract as: "(1) the contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification;

and (5) damages resulting therefrom." .... In addition to the five elements, "[a]n action for tortious interference with a contract is predicated on malicious conduct by the defendant." *Dickens*, 255 Kan. 164, Syl. ¶ 1, 872 P.2d 252.

In *DP–Tek, Inc. v. AT & T Global Inform. Solutions*, 100 F.3d 828, 831–32 (10th Cir.1996), the Tenth Circuit concluded that the Kansas Supreme Court would adopt the business competitor's privilege identified in Restatement (Second) of Torts § 768. The court noted that:

> Kansas recognizes that "not all interference in present or future contractual relations is tortious. A person may be privileged or justified to interfere with contractual relations in certain situations." [*Turner v. Halliburton Co.*, 240 Kan. 1, 722 P.2d 1106, 1115 (1986) ]; *see also Noller v. GMC Truck & Coach Div.*, 13 Kan.App.2d 13, 760 P.2d 688, 699 (1988) ("Intertwined in this problem are the actions of [the defendant], which may be justified or privileged—that is, proper rather than improper."), *rev'd on other grounds*, 244 Kan. 612, 772 P.2d 271 (1989).

The court will deny plaintiff's motion for summary judgment on their claim of tortious interference. . Even assuming the business competitor's privilege contained in Restatement (Second) § 768 was not applicable, the plaintiffs have still failed to demonstrate that they are entitled to a determination of liability on the part of the defendants.

---

22. This provision of the Restatement provides:

(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

  (a) the relation concerns a matter involved in the competition between the actor and the other and

  (b) the actor does not employ wrongful means and

  (c) his action does not create or continue an unlawful restraint of trade and

  (d) his purpose is at least in part to advance his interest in competing with the other.

(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

■ Liability for tortious interference with contractual relations requires more than simply invoking a noncompetition clause to defeat a defense of competitor's privilege; the underlying merits of the claim must still be established. In *Turner v. Halliburton*, 240 Kan. 1, 12, 722 P.2d 1106 (1986), the court explicitly cited with approval the standard set forth in Restatement (Second) of Torts § 767. Section 767 is "the general balancing test applicable in tortious interference claims." *DP–Tek*, 100 F.3d at 832. It provides:

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

■ The balancing required under Section 767 and the general elements of a claim for tortious interference with contract under Kansas law preclude an award of summary judgment in favor of plaintiffs. The defendants' motives and actions are not so clearly established that the court could determine beyond a reasonable doubt that the tort had been committed. The uncontroverted facts do not establish that, in obtaining the services of the thirteen physicians, the defendants acted maliciously, with an intent to injure Wichita Clinic or IHS. Moreover, Section 767 explicitly states that consideration should be given to the nature of the defendant's conduct, the relations between the parties, and the interests which the plaintiff seeks to protect.

Here, the uncontroverted facts establish that, following the collapse of the joint venture negotiations, Wesley informed Wichita Clinic that it would pursue a policy of directly employing physicians; the defendants did not act surreptitiously. The contractual provisions which the plaintiffs invoke—covenants preventing free employment with the employer of one's choosing—are not agreements favored under the law. The defendants' actions in entering the physician services market has not been shown to have decreased competition, and may in fact have increased it, thereby advancing the public interest. Finally, in the same contract which contained the noncompetition provision, the Wichita Clinic could and did insert a provision for liquidated damages, providing independent protection for its interest.

Similarly, the court must deny the separate argument made by plaintiffs that summary judgment should be awarded in favor of IHS on the claim of tortious interference with contractual relations. The plaintiffs argue that IHS was an intended beneficiary of the employment agreements between Wichita Clinic and the physicians. This argument is without merit. The uncontroverted facts establish that IHS was not a direct participant in the employment agreements. Further, there is no evidence from which a rational finder of fact could conclude that the parties to those agreements intended to benefit IHS in any meaningful way. *See Noller v. GMC Truck & Coach Div.*, 244 Kan. 612, 772 P.2d 271 (1989). Plaintiffs provide no authority for the suggestion that Kansas law would support an award to IHS for intentional interference with contract under these facts.

The defendants argue (1) the physicians employment agreements were not "breached" so as to justify a tort action since the noncompete portions of these agreements provided for alternative forms of performance by either not competing or paying specified damages; (2) the contracts should be deemed void against public poli-

cy; and (3) any damages should be limited to the liquidated damages specified with the employment agreements. The court finds the first argument must be rejected.

Under Kansas law, a plaintiff alleging tortious interference with prospective contractual relations must show "(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct." *Turner v. Halliburton Co.*, 240 Kan. 1, 722 P.2d 1106, 1115 (1986). A plaintiff asserting tortious interference with an existing contract must prove (1) the existence of a contract; (2) defendant's knowledge of the contract; (3) intentional interference with the known contract without legal justification; and (4) resulting damage to plaintiff. *Brown Mackie College v. Graham*, 768 F.Supp. 1457, 1460–61 (D.Kan.1991), *aff'd*, 981 F.2d 1149 (10th Cir.1992).

The defendants argue the claim for tortious interference with contractual relations should be dismissed, since the physician employment agreements were not "breached," but simply provided another means of performance, namely, the payment of specified damages. The defendants argue that the employment agreements provided an alternative contract, in which the physicians could either refrain from competition within a given area, or compete but pay a given penalty.

The plaintiffs contend that the employment contracts cannot constitute an alternative contract, and cite the decision of the Tenth Circuit in *Public Serv. Co. of Oklahoma v. Burlington N. R.R.*, 53 F.3d 1090, 1098–99 (10th Cir.1995) where the court noted a distinction between liquidated damages provisions and alternative contracts:

However, a contract with a liquidated damages provision is not an alternative contract. 5 A. Corbin, *Corbin on Contracts* § 1082, at 462 (1964). "Where a contractor promises to render a certain performance or, in default thereof, to pay a definite sum as liquidated damages, he has not made an alternative contract." *Id.*

The difference between alternative performance and liquidated damages is lucidly explained in § 1082 of *Corbin on Contracts*:

It is evident that some alternative contracts giving the power of choice between the alternatives to the promissor can easily be confused with contracts that provide for the payment of liquidated damages in case of breach, provided that one of the alternatives is the payment of a sum of money.... If, upon a proper interpretation of the contract, it is found that the parties have agreed that either one of the two alternative performances is to be given by the promissor and received by the promissee as the agreed exchange and equivalent for the return performance rendered by the promissee, the contract is a true alternative contract.

*Prenalta Corp. v. Colorado Interstate Gas Co.*, 944 F.2d 677, 689 (10th Cir.1991) (*quoting Corbin* § 1082, at 463–64.)

The defendants' argument must be rejected. The employment agreements here provided:

Upon termination of this Agreement, DOCTOR agrees that he/she will not, for a period of three (3) years thereafter, directly or indirectly engage in the practice of DOCTOR's profession in Sedgwick County, Kansas. DOCTOR further agrees that if DOCTOR should leave the employment of the CLINIC for any reason and continue the practice of his/her profession in Sedgwick County, Kansas, during said three year period DOCTOR shall pay the CLINIC, as liquidated damages and not as a penalty,

25% of all earnings collected from such practice during such period. . . .

(Def.Exh.87)

Thus, by their terms, the agreements explicitly consider the compensation for competition as "liquidated damages" rather than another, alternative form of performance. In addition, the effect of the agreement would appear to effectively terminate the contractual relationship upon unauthorized competition, which would suggest that the damages provision was not an alternative contract. *See In re The Community Med. Ctr.*, 623 F.2d 864, 867 (3d Cir.1980) (construing a contract provision as an alternative contract since the "clause, fairly interpreted, looks more to a continuance of the relationship between [the parties] rather than termination").[23]

█ The court finds the defendants' argument that the restrictive covenants are void against public policy must be rejected. In *Weber*, the court explicitly concluded that the restrictive covenant on the physician's ability to compete did not violate public policy to the extent that the restraint is "reasonable under the circumstances." 259 Kan. at 462, 913 P.2d 84. *See also Foltz v. Struxness*, 168 Kan. 714, 215 P.2d 133 (1950). Here, the noncompete provisions are limited in geographic scope and in duration. Further, the provisions can be understood as fairly protecting the investment of the Clinic in helping to establish the physician's practice. *Weber*, 259 Kan. at 466–67, 913 P.2d 84.

In their reply, defendants argue they are not contending the restrictive covenants are void against public policy *per see*, but that they are void to the extent the Clinic is attempting to leverage them into a tort action against a third person, as opposed to simply enforcing the contract against their former employees. This may be a basis for distinguishing *Weber*, but ultimately the court finds it is unnecessary to resolve the issue since the court finds that summary judgment is appropriate based on the existence of the liquidated damages paid to plaintiffs. That is, any recovery plaintiffs could obtain under their tortious interference with contract claims is limited to the liquidated damages specified in the employment contracts. Given the uncontroverted evidence that the defendants have paid, or are committed to paying these sums as they become due, the

---

**23.** The court notes that there is some authority from Kansas which discusses similar noncompete provisions in the context of "alternative" performance. Thus, in *Weber v. Tillman*, 259 Kan. 457, 913 P.2d 84 (1996), the court dealt with the validity of a provision limiting the ability of a physician to practice within a specified area. The agreement provided that the physician would not practice within 30 miles of his prior practice for two years, or "[a]lternatively, you may elect to practice in the aforementioned area upon payment of an amount equal to six months salary and bonus." *Id.* at 459, 913 P.2d 84. The court noted the defendant could be liable for damages since he "did not pay *liquidated damages* under the *alternative provision* of the restrictive covenant" *Id.* at 460, 913 P.2d 84 (emphasis added). This language suggests that in Kansas the actual language used—"liquidated damages" versus "alternative contract"—is not controlling.

What would be controlling is the intent of the parties: whether they considered unauthorized competition to be a "breach" of the employment agreement. Here, there is some indication that they did not. This arises from the response of plaintiffs to prior competition by four cardiologists. The cardiologists had noncompete provisions in their employment contracts which, for present purposes, are the equivalent of the provisions in the physicians who left the Clinic to work for Wesley. Significantly, the Clinic did not sue the cardiologists for breach of the employment agreement due to the competition, but alleged breach for failing to pay the liquidated damages. In the present case, IHS was asked if it had made any demands against other persons for matters arising out of their employment agreements. Referencing the cardiologists' case, IHS responded that it was not necessary for IHS to become involved because "the physicians . . . satisfied their contractual obligations to the Clinic" by paying the specified damages. (Uncontr. Fact ¶ 347; 348–50).

The court finds that, given the absence of clear evidence as to the intent of the parties on the issue of alternative contracts, summary judgment on these grounds would be inappropriate.

action for tortious interference is without merit.

A plaintiff in an action for interference with contract may obtain damages against the tortfeasor, but any recovery is reduced by the amount the plaintiff recovers under the contract. In *Equifax Services v. Hitz*, No. 89–2047–S, 1991 WL 17651 (D.Kan. Jan. 24, 1991), *aff'd*, 968 F.2d 1224, 1992 WL 163282 (10th Cir.1992), Judge Saffels suggested that breach of contract damages would have the effect of satisfying a claim for tortious interference with contract. *See Western Oil & Fuel v. Kemp*, 245 F.2d 633 (8th Cir.1957) (limiting damages to that recoverable in an action for breach of contract); *Memorial Gardens v. Olympian Sales & Mgt. Consultants*, 690 P.2d 207, 212 (Colo.1984) (awarding no damages for tortious interference where plaintiff received benefits of liquidated damages provision).

" 'Where the parties contemplate a remedy in the event of breach, and the provisions of the contract cover the consequences of default, the bargained-for existence of a contractual remedy displaces the imposition of tort duties.' " *Curtis 1000, Inc. v. Pierce*, 905 F.Supp. 898, 903 (D.Kan.1995) (*quoting Atchison Casting Corp. v. Dofasco, Inc.*, 889 F.Supp. 1445, 1461 (D.Kan.1995)). The court finds such a result is particularly appropriate in the present action, where the contracts which form the basis for the tortious interference claim—the noncompetition agreements between the physicians and the Clinic—are agreements which are strongly disfavored in the law.[24] Accordingly,

the court holds that the plaintiffs may not recover any damages under their claim of tortious interference beyond the liquidated damages specified in the employment contracts. Since the defendants have represented that they either have paid, or will pay, all sums due under the liquidated damages provisions as they become due, and since these representations are not the subject of any factual dispute, the court finds that summary judgment on the claim of tortious interference is appropriate.

### 5. Tortious Interference with Prospective Business Relations

Under *Turner v. Halliburton Co.*, 240 Kan. 1, 722 P.2d 1106, 1115 (1986), a claim of tortious interference with prospective economic relations require proof of:

> (1) the existence of a business relationship or expectancy . . .; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by the defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.

The Tenth Circuit has held that, under Kansas law, a claim for interference with a prospective contract requires proof. The plaintiff must prove defendant's interference occurred through the employment of "wrongful means," which is defined as "in-

---

**24.** In *H & R Block, Inc. v. Lovelace*, 208 Kan. 538, 544, 493 P.2d 205 (1972), approved as "trenchantly stated" the distinction drawn in *Arthur Murray Dance Studios of Cleveland v. Witter*, 105 N.E.2d 685 (Ohio Com.Pl.1952) between attempts to enforce noncompetition agreements against former employees on the one hand, and against sellers of an established business on the other. A seller of an established business has more freedom in resisting the pressure to include such a clause in a contract of sale than an employee—even a physician—does in preventing the inclusion of such a provision in an employment con-

tract. Thus, the Kansas court quoted with approval the statement in *Arthur Murray* that typically a noncompetition agreement between employer and employee

> is more critically examined, more strictly construed—it is construed favorably to the employee—it is viewed with askance and more jealously—it is not viewed as liberally or with the same indulgence—it is looked upon with less favor, more disfavor—courts are more loathe, less disposed and more reluctant to sustain or enforce it. . . .

208 Kan. at 544–45, 493 P.2d 205 (quoting *Arthur Murray*, 105 N.E.2d at 703–04).

dependently actionable conduct." *DP–Tek*, 100 F.3d at 835.

The court will grant summary judgment against IHS's claim that the defendants tortiously interfered with its prospective business relations. There is no allegation in the pretrial order that the defendants caused IHS to breach its contract with the Clinic. The courts in this district which have considered the issue have concluded that "an action for tortious interference with contract does not extend to claims of adverse impact or increased burden which fall short of inducing or causing actual breach." *Classic Communications v. Rural Tel. Serv.*, 956 F.Supp. 910, 921 (D.Kan.1997); *See also Pizza Management, Inc. v. Pizza Hut. Inc.*, No. 86–1664–C, 1989 WL 46253 (D.Kan. April 14, 1989). Here, plaintiffs have merely alleged that the defendants' actions have increased the costs of IHS in servicing its contract with the Clinic. The court finds that this does not rise to the level of tortious interference with prospective business relations.

## 6. Trade Secrets

The defendants have not moved for summary judgment on the trade secrets claim. The plaintiffs have, albeit in a desultory fashion in the last few pages of their brief. Summary judgment will be denied. As discussed in the findings of fact, there are significant factual questions involving what, if any, trade secrets were misappropriated by the defendants. Generally, questions involving misappropriation of trade secrets are fact questions which should be resolved at trial. *Curtis 1000, Inc. v. Pierce*, 905 F.Supp. 898, 903 (D.Kan.1995).

## 7. Breach of Confidentiality Claim

■ The plaintiffs' claim of breach of the confidentiality provision of the Letter of Intent will be dismissed. In the Letter of Intent, the Clinic and Wesley agreed they would protect confidential information exchanged during the negotiations; the agreement does not provide that all information exchanged was or would be consid-

ered confidential. The agreement does not prohibit either party from "using" the confidential information. A breach occurs only if one party is improperly "disclosing" confidential information "to any third party."

The uncontroverted facts establish that the only entity to which the defendants may have "disclosed" any matter even potentially confidential was a letter to Mid–States Diagnostics, which made reference to the joint venture negotiations. This cannot represent a breach of the Letter of Intent, since the letter could not constitute a "disclosure." First, the letter was sent only after public notice of the joint venture negotiations had occurred. Second, Mid–States Diagnostics is owned by four physician-employees of the Clinic.

In their response to defendants' summary judgment motion, plaintiffs abandon their contention that the Mid–States Diagnostics letter breached the confidentiality clause of the Letter of Intent. Instead, they seek to substitute allegations that disclosures were made to three other individuals. This alteration is unsupported by admissible evidence. The plaintiffs conceded in the interrogatory answers that only identifiable party to whom disclosures were made was Mid–States Diagnostics. The plaintiffs have attempted to modify their answers with unverified interrogatory answers, but these are not a valid basis for factual findings in response to a summary judgment motion. *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273 (2nd Cir.1968).

## 8. Unjust Enrichment and Diminution of Value

■ Finally, the court must concur with the defendants that the damages claims advanced by the plaintiffs should be restricted. The plaintiffs have included a claim for unjust enrichment both for the profits the defendants made from hiring the thirteen physicians (some $12.8 million), and their profits from the contract with Blue Cross Contract (some $72 to

110.3 million). The latter, however, is not a valid measure of unjust enrichment damages for the plaintiffs. A claim for unjust enrichment requires proof of "a benefit conferred upon the defendant by the plaintiff." *J.W. Thompson Co. v. Welles Prod. Corp.*, 243 Kan. 503, 512, 758 P.2d 738 (1988). Here, the profits from the Blue Cross contract were not conferred by the Clinic or IHS; they were conferred by Blue Cross. Even assuming defendants wrongfully obtained the Blue Cross contract, they did not thereby obtain money that either came from or was owed to the Clinic or IHS.

The plaintiffs' diminution of value damages must also be restricted. The plaintiffs' expert has calculated diminution of value damages in the range of $122 million, based on a comparison of the actual value of the Clinic and IHS on January 1, 1998 (which he estimates as $28 million), in comparison to their value on that date if the 1994 "Strategic Plan" had been fully implemented (estimated at $101 million), adjusted for tax effects and "grossed up." (Uncontr. Fact ¶¶ 421–23).

■■■ This chooses the wrong benchmark. The proper measure of diminution of value in these circumstances is to compare the value of the business before and after its claimed injury. *Mattingly, Inc. v. Beatrice Foods*, 835 F.2d 1547, 1559 (10th Cir.1987), *vacated on other gds.*, 852 F.2d 516 (10th Cir.1988). Thus, any effect on the plaintiffs' value should be determined on the basis of their value in 1994 or 1995, or 1996 at the very latest, the period of the unsuccessful negotiations and the fraudulent actions, if any, by the defendants. Further, to the extent the defendants seek lost profits after the point at which the diminution of value comparison was made, this would constitute a double recovery.

The court neither invites nor encourages a motion for reconsideration. Any motion for reconsideration must comply with Fed R.Civ.P. 59 and 60, D.Kan. Rule 7.3. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of due diligence. *Anderson v. United Auto Workers*, 738 F.Supp. 441, 442 (D.Kan.1990). Such a motion may not revisit issues already addressed, nor may it advance new arguments or supporting facts which were otherwise available for presentation when the original summary judgment motion was briefed. *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir.), *cert. denied*, 506 U.S. 828, 113 S.Ct. 89, 121 L.Ed.2d 51 (1992).

Given the grossly repetitive briefing previously submitted, any such motion and accompanying memoranda may not exceed ten double-spaced pages in length, including supporting arguments and authorities, regardless of the number of points raised. A response shall also be limited to ten pages. No replies may be filed.

IT IS ACCORDINGLY ORDERED this 31st day of March, 1999, that the plaintiffs' motion for partial summary judgment (Dkt. No. 159) is denied; the defendants' motions for partial summary judgment (Dkt. No. 144) are granted in part and denied in part, as provided herein.

### MEMORANDUM ORDER

The facts in the present action by plaintiffs Wichita Clinic and its affiliated service company Integrated Healthcare Systems against defendants Columbia/HCA Healthcare Corporation and HCA Health Services of Kansas have been set forth by the court in its March 31, 1999 order resolving the competing summary judgment motions submitted by the parties. (Dkt. No. 228). In that order, the court denied the plaintiffs' motion for summary judgment on several of its state tort law claims, while granting the defendants' motion seeking dismissal of the federal antitrust claim and most of the state tort claims. The defendants did not move, and the court did not rule, on the continued validity of the two remaining claims in the present matter, the claim of misappropriation of trade se-

crets, and the claim of tortious interference with business expectancy. Currently before the court are the motion by the plaintiff to reconsider the order of March 31 and the motion of the defendants to clarify that order. In the latter motion, as further amplified in the court's conference with the parties on April 19, 1999, the defendants have requested the court dismiss the remaining claims in their entirety in light of the court's findings of fact. The court has completed the task of once more reviewing the materials submitted by the parties in connection with their summary judgment motions, and is prepared to rule.

▆▆▆▆ A motion to reconsider under Fed.R.Civ.Pr. 59(e) may be granted to correct manifest errors, or in light of newly discovered evidence; such a motion is directed not at initial consideration but reconsideration, and is appropriate only if the court has obviously misapprehended a party's position, the facts, or applicable law, has mistakenly decided issues not presented for determination, or the moving party produces new evidence which it could not have obtained through the exercise of due diligence. *Anderson v. United Auto Workers,* 738 F.Supp. 441, 442 (D.Kan.1989). A motion to reconsider is not "a second chance for the losing party to make its strongest case or to dress up arguments that previously failed." *Voelkel v. GMC,* 846 F.Supp. 1482 (D.Kan.), *aff'd,* 43 F.3d 1484 (10th Cir.1994). The resolution of the motion is committed to the sound discretion of the court. *Hancock v. City of Oklahoma City,* 857 F.2d 1394, 1395 (10th Cir.1988).

▆▆▆▆ The court finds that the plaintiffs' motion for reconsideration must be denied. The plaintiffs do not demonstrate that the

court erred in its findings of fact or conclusions of law. Rather, the court finds that the motion substantially repeats arguments previously advanced in the summary judgment pleadings. With respect specifically to plaintiffs' claim of fraud, the court finds that plaintiffs have failed to present evidence demonstrating either reasonable reliance on any representations by the defendants, or that the plaintiffs actually relied in fact on such representations. Further, the plaintiffs have failed to present evidence of a clear and convincing nature indicating the defendants acted with fraudulent intent. All of the evidence of "intent" cited by plaintiffs is wholly consistent with the proposed joint venture between plaintiffs and defendants. With respect to the claim for tortious interference with contract, the court finds the plaintiffs' arguments equally misplaced.

The court finds that the arguments advanced by plaintiffs are without merit. Given the particular facts of the case, summary judgment was appropriate. The plaintiffs are entitled to invoke the protection of the noncompetition provisions in the physician employment contracts, but, as noted in the court's opinion, such provisions are strongly disfavored by the law. Given that the same employment contracts also contain liquidated damages provisions in which the parties have represented stipulated amounts as reasonable compensation for violation of the (disfavored) noncompetition clauses, the court believes the better rule is to restrict the plaintiffs to the recovery of the stipulated damages.

As noted earlier, the court has reviewed the parties' statements of uncontroverted facts and evidentiary materials which were submitted in connection with the summary judgment motions.[1] The court finds that

1. The court notes that, in their portion of the briefing invited by the court on the matter, the defendants have appended a series of 100 factual findings, of which 82 are premised directly on the court's prior findings or on evidentiary materials previously submitted to the court at the time of the summary judgment pleadings. The court finds these proposed findings accurately state uncontroverted facts in the present matter. The plaintiffs have not had the opportunity to respond to the remaining proposed findings (Def.Br. at ¶¶ 83–100, pp. 18–21) which are premised on additional factual materials, and the court makes no findings as to these specific matters in the present order. However, as noted elsewhere, the facts which have been established compel summary judgment on the claims of trade secret misappropriation and tortious interference with business expectancy.

the uncontroverted facts established thereby require dismissal of the remaining portions of the case. In its prior order the court denied plaintiffs' motion for summary judgment in their favor on the issues of trade secret misappropriation and tortious interference with business expectancy. The court hereby finds that the facts require summary judgment against the plaintiffs on those issues. *Dickeson v. Quarberg,* 844 F.2d 1435, 1444 n. 8 (10th Cir.1988) (quoting 10A Charles Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure: Civil 2d,* § 2720) (weight of authority allows granting of summary judgment in favor of non-moving party).

■ The plaintiffs' trade secrets claim fails for two reasons. First, the evidence does not support any finding of misappropriation. In the pretrial order, the plaintiffs contend that a trade secret misappropriation occurred when the defendants used trade secret information to hire physicians away from Wichita Clinic. However, the court specifically found in its order that the defendants had not disclosed any trade secret information to any third party (Order, at 35), and that the defendants had not used any confidential information to hire physicians. (Id., at 32). The defendants were permitted to make limited disclosure of certain information for valuation purposes, and knew that the defendants had retained Greg Koonsman of Ernst & Young for that reason. Beyond this limited and consensual disclosure, the defendants did not otherwise use the financial information supplied by plaintiffs.

The court further finds that the matters identified by the plaintiffs were not "trade secrets" as that term is defined under Kansas law. Under K.S.A. 60–3320(4), a trade secret is information which

(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other

persons who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Here, the plaintiffs contend that the defendants illegally misappropriated information relating to physician productivity and compensation, patient lists, and other financial information. However, the uncontroverted facts establish that physician compensation and productivity information were not trade secrets. The physicians felt they were free to disclose this information to third parties and had never heard of any attempt to protect such information. The CEO of Wichita Clinic explicitly testified in his deposition that physicians were permitted to share information about productivity and compensation with anyone. (Perkins Dep. at 127–28). Similarly, the plaintiffs had no policy of stamping patient lists [2] as confidential or otherwise protecting this information. Further, plaintiffs have failed to identify any patient lists which supposedly were misappropriated. *See Webster Eng'ng & Mfg. v. Francis,* No. 89–1416–FGT, 1993 WL 406025, at *4 (D.Kan. Sept.1, 1993) (noting plaintiffs' failure to show there were no efforts to inform employees of secrecy of information); *Pulsecard, Inc. v. Discover Card Services,* No. 94–2304–EEO, 1996 WL 137819, at *6 (D.Kan. March 5, 1996) (granting summary judgment in part on the failure of plaintiff to identify any misappropriated customer list). In the same vein, plaintiffs have failed to demonstrate any of the allegedly misappropriated financial information was subject to reasonable protective efforts. To the contrary, it appears that "financial information" was not included in the plaintiffs' written policies on confidentiality until six months *after* the present action was filed. The uncontroverted facts establish that the plaintiffs had not undertaken reasonable efforts to

---

**2.** The allegedly misappropriated information involves patient lists, as opposed to the medi-

cal records of individual patients.

maintain the confidentiality of the alleged "secrets." Finally, the court finds plaintiffs' generalized claim of the disclosure of "financial information" is simply too vague to support a claim for trade secret misappropriation.[3]

Summary judgment is equally appropriate for the claim by plaintiffs that the defendants' actions represent tortious interference with business expectancy. Specifically, the plaintiffs have alleged that the defendants tortiously interfered with (1) IHS's business expectancy with Wichita Clinic, and (2) Wichita Clinic's business expectancy with its patients. The court finds that the claim for tortious interference must be dismissed for two reasons.

■■■■ Under Kansas law, the claim of tortious interference is predicated on malicious conduct. *Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164, 169, 872 P.2d 252 (1994). Malice in Kansas law is defined as "actual evil-mindedness or specific intent to injure." *Munsell v. Ideal Food Stores*, 208 Kan. 909, 921, 494 P.2d 1063 (1972). In *Hawkinson v. Bennett*, 265 Kan. 564, 599–600, 962 P.2d 445 (1998), the court cited with approval jury instructions stating that, in order to find defendants had tortiously interfered with a contract, the jury must find that the defendants "induced the breach of contract with actual malice," which was then further explicitly defined in the terms set forth in *Munsell.* The element of actual malice is required in both actions for tortious interference with contract and tortious interference with prospective business advantage. *Petroleum Energy v. Mid–America Petroleum*, 775 F.Supp. 1420, 1429 (D.Kan.1991). Here, in rejecting the plaintiffs' claim of fraud, the court has specifically found that plaintiffs have failed to present any evidence indicating the defendants were acting with a secret, malicious motive in the joint venture negotiations. The uncontro-

verted facts establish that the defendants were not acting with malice, and the claim for tortious interference must be dismissed.

■■■■ In addition, the court finds that dismissal is appropriate pursuant to the defense of the competitor's privilege. The competitor's privilege has been set forth in Restatement (Second) of Torts § 768(1):

> One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>
> (a) the relation concerns a matter involved in the competition between the actor and the other and
>
> (b) the actor does not employ wrongful means and
>
> (c) his action does not create or continue an unlawful restraint of trade and
>
> (d) his purpose is at least in part to advance his interest in competing with the other.

See *DP–Tek, Inc. v. AT & T Global Info. Solutions Co.*, 100 F.3d 828, 833 (10th Cir. 1996) (holding that Kansas would adopt the privilege).

Given the court's earlier findings, all of the elements of the defense were clearly established with one exception—whether the defendants might have employed "wrongful means" by their misappropriation of trade secrets. As noted earlier in the present order, the claim of trade secret misappropriation cannot stand in light of the uncontroverted facts. Since the plaintiffs have failed to offer evidence which would prevent the application of the competitor's privilege, the court finds that the claim for tortious interference with business expectancy should be dismissed.

---

**3.** The defendants' motion to clarify argues that IHS does not have any ownership interest in the patient files, physician compensation, or financial information, and accordingly should be dismissed from the action.

Given that court's decision that the trade secret claims themselves are without merit and must be dismissed, the court finds it unnecessary to resolve the issue.

IT IS ACCORDINGLY ORDERED this 11th day of May, 1999, that the plaintiffs' motion for reconsideration (Dkt. No. 231) is denied, the defendants' motion to clarify (Dkt. No. 233) is denied as moot, and the court grants summary judgment as to claims of plaintiffs for trade secret misappropriation and tortious interference with business expectancy.